STATE, RESPONDENT, v. WOOLSEY, APPELLANT.

(No. 6,163.)

(Submitted September 20, 1927.   Decided October 3, 1927.)

[259 Pac. 826.]

*Criminal Law—Obtaining Money by False Pretenses—Principal and Agent—Evidence—Insufficiency.*

Obtaining Money by False Pretenses—What Constitutes Crime.
  1.  To constitute the crime of obtaining money by false pretenses, denounced by section 11410, Revised Codes 1921, the accused must have made such representations of past events or existing facts to the injured person knowing them to be false when he made them, that the defrauded party believed them to be true and, relying thereon, parted with money or property which was received by the accused, and that the latter intended to defraud the accuser.

Same—Principal and Agent—When Principal not Criminally Liable for Unlawful Acts of Agent.
  2.  The civil doctrine that a principal is bound by the acts of his agent within the scope of the latter's authority has no application to criminal law; to make the principal criminally liable for the unlawful acts of the agent committed in connection with the former's business, it must appear that the principal directed the agent or knowingly assented to or acquiesced in the agent's acts, authority to do a criminal act never being presumed.

Same—Criminal Act of Agent—Conviction of Principal—Evidence—Insufficiency.
  3.  An agent of defendant by means of false representations sold corporate stock to the complaining witness. There was no evidence that defendant directed or authorized such misrepresentations or that a conspiracy existed between the two for the commission of the act, or that defendant received the money obtained or profited by the agent's operations, or that he prepared or authorized the use of the stock subscription blanks used by the agent. There was testimony that about a year after the sale by the agent, defendant made representations similar to those made by the agent to others in an endeavor to make sales of stock. *Held,* that the evidence was insufficient to support a judgment of conviction under the above rules.

Criminal Law—Evidence—Conviction cannot Rest upon Suspicion or Conjecture.
  4.  A conviction for crime may not be based upon conjecture, probabilities or suspicion, however well founded, but may rest only upon proof which logically compels the conclusion that de-

1.  See 11 R. C. L. 831.
2.  See 8 R. C. L. 66.
4.  See 8 R. C. L. 180.

fendant is guilty beyond a reasonable doubt, and where the evidence is unsubstantial and speculative, the verdict must be set aside on appeal.

[1]    False Pretenses, 25 C. J., sec. 13, p. 590, n. 93; sec. 27, p. 599, n. 89; sec. 31, p. 603, n. 8; sec. 32, p. 604, n. 16; sec. 54, p. 618, n. 47; sec. 56, p. 623, n. 86; sec. 59, p. 625, n. 11, 14; sec. 60, p. 626, n. 29; sec. 61, p. 628, n. 42; sec. 71, p. 635, n. 14; sec. 74, p. 637, n. 36.
[2, 3]    Criminal Law, 16 C. J., sec. 106, p. 123, n. 20, 21, 22, 23; sec. 109, p. 125, n. 38 New; sec. 156, p. 144, n. 63 New. False Pretenses, 25 C. J., sec. 53, p. 618, n. 45 New; sec. 88, p. 650, n. 42.
[4]    Criminal Law, 16 C. J., sec. 1590, p. 779, n. 98; 17 C. J., sec. 3593, p. 257, n. 68, p. 262, n. 76.

*Appeal from District Court, Missoula County; Asa L. Duncan, Judge.*

G. V. Woolsey was charged with obtaining money by false representations, and appeals. Reversed and remanded, with direction to dismiss the information.

*Mr. P. E. Geagan,* for Appellant, submitted a brief and argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. I. W. Choate,* Assistant Attorney General, for the State, submitted a brief; *Mr. Choate* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

By information G. V. Woolsey and W. B. Stone were charged jointly with the crime of obtaining money by false representation and pretense from one Cora M. Doll. Specifically, it was charged that between the twenty-ninth day of March, 1923, and the second day of July, 1923, they represented themselves, respectively, to be the secretary and agent of the Western Home Improvement Company, a corporation; represented that the corporation was incorporated for $500,000, the capital stock of which was paid up and divided into 10,000 shares of the par value of $50 each; that the company was a building and loan association and functioned as such; that the success of the company was based on first mortgages, that it

operated along proved successful channels for loaning money
on good securities, financing worthy enterprises, and construct-
ing homes for sale on a monthly purchase plan, and that it
provided annuities for old age; that they, the defendants, could
sell to Cora M. Doll but a limited number of shares of stock
in the company; that no single purchaser could hold to exceed
10 shares of $50 each, but that special concessions would be
made to her and she would be allowed a greater amount; that
by means of such representations they obtained from her the
sum of $6,000; that she relied upon such representations and
believed them to be true, and so relying paid her money to the
defendants during the period of time stated; that such repre-
sentations were false, and were known by the defendants to
be false, in that the corporation was not a building and loan
association and did not function in the same manner; that it
did not have any money loaned on first mortgages; that its
success was not based on first mortgage loans; that it had not
financed any worthy enterprises and had not constructed any
homes for sale on a monthly purchase or any other plan, and
that it had not provided annuities for old age; that its capital
stock was not paid up, and that, in truth and in fact, the cor-
poration had no assets except a limited amount which had long
prior thereto been consumed and used by the defendants for
their operating and living expenses; and that the stock was
worthless and to the defendants known to be such at the time
of the sale thereof of which complaint is made; that the repre-
sentations so made by the defendants were made knowingly
and designedly and with intent in them to defraud Cora M.
Doll out of such money; and that they did so defraud and
cheat her.  Upon his plea of not guilty, the defendant G. V.
Woolsey was separately tried on the information to a jury,
which returned a verdict finding him "guilty as charged in the
information, and that he obtained from Mrs. Cora M. Doll by
means of false representation and pretense the sum of $2,500."
By its further verdict the punishment of the defendant was

left to the court. The court imposed sentence that the defendant be imprisoned in the state prison for not less than four nor more than eight years, and judgment was entered accordingly. The defendant made motion for a new trial, which was denied, and the case is now before us on appeal from the judgment.

Many alleged errors committed at the trial are assigned by the defendant, and a voluminous brief has been filed by his learned counsel. In disposition of the appeal, however, it is necessary to consider only one of the several questions presented, namely, is the evidence sufficient to sustain the verdict?

Upon the trial, at the conclusion of the state's case, the defendant moved the court to direct the jury to acquit him. The motion was denied, and he thereupon rested without offering any evidence. The apparent theory of the prosecution is that the defendant Woolsey is guilty as a principal, being criminally responsible for the representations and inducements made by Stone, his authorized agent. From a perusal of the entire record, and particularly noting all evidence reflecting upon the possible guilt of the defendant Woolsey, it appears that at least from early in the year 1921 until the month of May, 1926, the defendant Woolsey maintained an office in the city of Miles City. This is deduced from the fact that Ethel E. Lasswell testified that she was there employed by him in the capacity of a stenographer for a period of about seven months prior to the fall of 1921, when she moved to Lewiston, Idaho; the subscription blanks used by him in connection with the Western Home Improvement Company, a corporation, which, in the year 1922, he had in process of organization, gave Miles City as his address as well as that of the company, and letters written by him as late as May 13, 1926, indicate that he still continued his office at that place. In the fall of the year 1922, at Lewiston, Idaho, he told Miss Lasswell that he was organizing a building and loan association and requested her to act as the president of such corporation, which she agreed to do. She was not acquainted with W. B. Stone, but at that time the de-

[80 Mont. 141.]

fendant Woolsey said "that he was going to try to get Mr. Stone to sell stock of the Western Home Improvement Company." Stone was actively engaged soliciting stock subscriptions in the city of Missoula for the company proposed the latter part of March, 1923. The stock subscription form used by Stone in obtaining contracts for the purchase of the capital stock in the corporation to be formed reads, in part, as follows:

"Western Home Improvement Company, Miles City, Montana. This book is the property of ——.

"The Home Builder—Your Home Built the Way *You* Want it.

"Capital, $500,000. Fully paid and nonassessable. Preferred stock, $250,000. Common stock, $250,000. Shares, $50 each. Sold only in combination of one share each of preferred and common for $100. Terms—$20 down, $10 each month, for 8 months, to Western Home Improvement Company.

"Western Home Improvement Company. Officers: E. E. Lasswell, President; Wm. Whitney Ames, Vice President; G. V. Woolsey, Secretary and Treasurer. Directors: Robt. D. Kent, President, Merchants' Bank of Passaic, N. J.; H. L. Gleason, Advertising, New York City; William Whitney Ames, Attorney, Montclair, N. J.; G. V. Woolsey, Miles City, Mont. * * *

"Application Blank.                         ——, 192—.

"I hereby apply for —— combination shares of stock of the Western Home Improvement Company, for the sum of $——, and have paid your representative the sum of $—— as first payment, and agree to pay $—— to the Western Home Improvement Company, at its home office, each and every 30 days thereafter, until the full purchase price has been paid.

"Name: ——.

"Address: ——.

"The first payment of $20 on each combination of stock is to be collected by the agent, who will enter the payment in this book. This serves as a receipt. Each month's payments are to be made direct or by mail to the Western Home Improve-

ment Company, Miles City, Montana. When the last payment has been made, the secretary will issue a stock certificate and take up this book. Do not fail to make your payments regularly. He who owns a home owns freedom and security for self and family.''

The latter part of March, 1923, Stone called at the blacksmith-shop conducted by John Doll, in the city of Missoula, and solicited the latter to make purchase of some of the stock. Stone said to Doll: ''I am selling building and loan stock; we organized a building and loan stock company at Miles City, and I am one of the agents to sell this stock.'' Doll inquired: ''How do you handle your stock or your finances?'' Stone replied: ''Buy and sell real estate or residences, and loan money to the stockholders to build their residences with.'' Doll asked: ''What percentage do you allow on property?'' And Stone replied: ''We allow from 50 to 60 per cent, according to the location of the property.'' In the evening of the same day Stone called at Mr. Doll's residence; and again discussing the subject Stone said: ''We can sell only $500 worth of stock to each individual, because our secretary and manager gave me orders not to sell any more to any individual than that $500.''

Shortly thereafter Stone took up his place of abode in Missoula with the Dolls, and remained with them from April until August, 1923. During that time he boarded and roomed with them, and on many occasions discussed with them the advantages of the Western Home Improvement Company as a building and loan corporation. As a result of such discussions he agreed to permit the Dolls to subscribe for a greater amount of the stock than the limit of $500 fixed as to any one person, should they so desire. Thereupon he obtained stock subscriptions for such stock, to the aggregate amount of $6,500, from the Doll household, which subscriptions were fully paid during the period from the latter part of March to July 2, 1923. Mrs. Doll's mother, who had made her home with the Dolls for

twenty years, and was then living with them, gave Mr. Stone her subscription for stock to the aggregate amount of $2,500, which subscription was later assigned to Mrs. Doll, and the stock when issued on May 5, 1923, was executed in the name of the latter. The Dolls paid $500 to Stone as an investment for their daughter Cora Wynona Doll, and certificates for five shares each of the common and preferred capital stock of the corporation, issued in the daughter's name, were delivered bearing date May 5, 1923. Mrs. Doll subscribed for fifty shares, twenty-five shares each of the common and preferred stock of the corporation, for which she paid the sum of $2,500, and the stock, represented by at least six certificates, was issued to her as Mrs. Cora M. Doll on May 5, 1923. John M. Doll subscribed for ten shares each of the common and preferred stock in the corporation, paying therefor the sum of $1,000. After the issuance of such shares of stock to him he transferred and assigned them to his wife, and upon her surrender of such shares to the company new stock certificates for a like kind and number of shares were issued to the prosecutrix in the name of Mrs. John Doll, under date of April 15, 1926.

Cora M. Doll, the complaining witness, testified: "At that time (referring to the time the stock subscriptions were made) that I talked to Mr. Stone, he said that Mr. Woolsey was the secretary of this corporation. At that time whatever money I parted with, I parted with on account of what Mr. Stone said to me; I paid the money to Mr. Stone; any money that I parted with was on account of Mr. Stone, the representations about the building and loan, and all I knew about that was what Mr. Stone told me; I had had no correspondence with Mr. Woolsey at that time; I did not know Mr. Woolsey and had never met him until more than a year after that; about a year after I met Mr. Stone I met Mr. Woolsey—Mr. Stone in 1923 and Mr. Woolsey in 1924. Up to the time I met Mr. Woolsey I had never had any correspondence with him; never received any correspondence from him, nor sent any to him only that stock that come, that was

all; the stock certificates, that is all I ever got from Mr. Woolsey, up to that time. As to my knowing whether I got the stock certificates from Mr. Woolsey or not, well, Mr. Woolsey signed it; the president, I believe, also signed it; it came from the corporation, that is what I meant to tell you. I suppose Mr. Woolsey was secretary of that corporation at that time, and Mr. Woolsey's signature is there; that is all I meant to say as having had correspondence with Mr. Woolsey at that time; that is the only thing that I could designate as correspondence from Mr. Woolsey up to April, 1924.'' Further, she stated that she purchased the stock in reliance upon the representations made to her by Stone; that she first met Woolsey in April, 1924, when her husband brought him to the house for dinner. On that occasion they discussed the business of the Western Home Improvement Company, and Woolsey told her that it was a building and loan company. ''He said he was calling on all of the stockholders.'' She further testified: ''I was one of the stockholders at that time, and had been one since March; I became a stockholder through Mr. W. B. Stone's representations of a building and loan, and I bought stock from him in March, 1923. He talked about Mr. Stone being his representative in this building and loan; it was all represented as building and loan by both of them. He said that Mr. Stone was selling this stock. Q. And for whom, if anyone? A. That he was selling it for the company, Western Home Improvement Company, a building and loan, of which Mr. Woolsey was secretary, at the time. When Mr. Woolsey came, he said that Mr. Stone was his representative and that he was selling stock in this Western Home Improvement Company; when I say 'he,' I mean that Mr. Woolsey told me that Mr. Stone was his representative, selling stock in the Western Home Improvement Company, a building and loan; that Stone was selling for Woolsey and the company, and Mr. Woolsey was secretary. That was the substance of the conversation at that time, as between myself and Mr. Woolsey. Mr. Woolsey himself did not sell me any stock at the time he was there. With refer-

ence to the stock, Mr. Woolsey said it was a good proposition; he did not make any offer to me to sell me more stock. I first met Mr. Woolsey in April of 1924, after Mr. Doll had become a director of the corporation.''

On March 28, 1923, Woolsey mailed the articles of incorporation proposed for the organization of the Western Home Improvement Company as a corporation under the laws of Montana, to Miss Lasswell for her signature as one of the incorporators, his letter of transmission, written at Miles City, reading as follows:

''My dear Ethel: Inclosed are the revised copies of the articles of incorporation of the Western Home Improvement Company. Will you please sign each after my name and have them acknowledged before a notary public? When returning to me, please send by registered mail. Pending the completion of the organization, sales are going along fairly well, and I believe this is going to be a winner. Sincerely, G. V. Woolsey. Don't forget to sign *E. E.*''

The company appears to have been incorporated about April 12, 1923, as its articles of incorporation were filed with the county clerk of Silver Bow county on that date. No showing is made as to the date of filing with the secretary of state, nor as to the date of the issuance of its certificate of incorporation. The articles of incorporation recite, among other things, ''that the purposes for which said corporation is formed are to loan money on first mortgage and other securities, to buy and sell real estate, to construct homes and deal in supplies incidental thereto,'' and by its articles the corporation appears to have attempted to capitalize the company for $500,000, divided into 10,000 shares of the par value of $50 each, 5,000 shares of common stock and 5,000 shares of preferred stock. ''The directors designated for the first three months and until their successors have qualified, five in number, are: Robt. D. Kent, Passaic, N. J.; E. E. Lasswell, Lewiston, Idaho; Wm. Whitney Ames, Montclair, N. J.; H. L. Gleason, New York, N. Y., G. V. Woolsey, Miles City, Mont. The incorporators are T. E. Fergu-

son, G. V. Woolsey, and E. E. Lasswell''—it being recited that each of them had subscribed for two shares of the capital stock of the corporation, and paid therefor the sum of $100, making the total amount of capital stock actually subscribed and paid for the sum of $300. Five hundred blank stock certificates were by the defendant Woolsey mailed to Miss Lasswell, from Spokane, on April 30, 1923, and in, a letter of even date, addressed to her from Spokane, Mr. Woolsey said:

"Dear Ethel: The inclosed check for $78, I believe, cleans our slate, but if I have neglected any items, please let me know. By parcel post I sent you to-day 500 certificates for the president to sign *E. E.* If you are whirlwind enough, I will be glad to have you ship them to me by Wednesday afternoon. Among other things, you are to receive 1 share of the preferred and common.''

Miss Lasswell testified that she signed them all as directed on April 30, 1923, the date they were received, and on May 9, 1923, Woolsey, by letter written at Miles City, acknowledged receipt of the stock certificates so signed by her, as president of the corporation. The stock certificates issued and delivered to purchasers are signed by E. E. Lasswell, as president of the company, and by the defendant G. V. Woolsey, as its secretary. The common stock certificates recite merely that the person named therein is the holder of a certain number of shares of the common stock in the Western Home Improvement Company, and the preferred stock certificates state that the person named is the owner of a stated number of shares of preferred stock in the corporation, and that the same "is entitled to an annual dividend of nine per cent payable out of the net profits of the company before any dividend is paid upon the common stock. Should the net profits in any year be insufficient to pay said preferred dividend, either in whole or in part, any unpaid portion thereof shall become a charge against the net profits of the company, and shall be paid out in full of said net profits before any dividends are paid upon the common stock. Said preferred stock is subject to redemption at the option of the

company at any time after ten years from the tenth day of January, 1923, upon payment of $55 per share and any accumulated dividends. Said preferred stock is not entitled to vote at stockholders' meetings of the company, nor to participate in profits beyond its fixed preferential, cumulative, annual dividend of nine per cent.''

On May 13, 1926, Woolsey wrote to Miss Lasswell, from Miles City, as follows:

''At the last annual meeting of the Western Home Improvement Company, I was elected president; yourself, vice-president; and Mr. Heckman, secretary and treasurer. Because of the newness of the work there has been some delay in getting out the notices of the proceedings, but I expect they will be out in a few days. You will see by this action that an attempt is being made to gradually let you out of office, and at the next meeting expect your name will be entirely eliminated. Your letter of the 1st indicates that the Dolls of Missoula have gotten in a dig that has upset you, but as they are the only disturbers, which is due to their extreme ignorance, I trust you will not be swayed by their propaganda. Your connection as an officer of the company has been greatly appreciated while the company has been in its embryonic stage, and, while I appreciate your attitude in the matter, I will esteem it a favor to have you serve as vice-president until next April, after which I will see to it that your name be not used again. The usual interest dividend of 9 per cent, was ordered paid on July 12th on the preferred stock.''

John Doll testified: ''I first became acquainted with the defendant G. V. Woolsey in the first part of April, 1924; that was at Miles City. Mr. Woolsey, their secretary, he sent us notices that they were going to have a meeting at Miles City, for the stockholders, and I just took it upon myself, and went down to see what there was doing, just for my own investigation; and when I arrived at Miles City, I met Mr. Woolsey; he met me like a gentleman, pleasantly—of course I didn't know him, I had never met him before—and he met me, and

[80 Mont. 141.]

shook hands, and I says, 'I am Mr. Doll, from Missoula.' 'Oh,' he says, 'I'm glad to meet you.' Well, very well. So we sat down in his office for a while and talked things over and it was getting pretty near lunch time, and he says, 'Well, we'll go to lunch now,' he says, 'and then after lunch we will have our meeting.' So I went to lunch and came back again at 1 o'clock. Mr. Woolsey hadn't returned yet, but later he came in, and we sat down and talked again, and I asked him, I says, 'Mr. Woolsey, who are the largest stockholders in this company?' 'Why,' he says, 'my wife and myself and my family, we own $12,000 in it, and,' he says, 'you and your family are next, and from there down, some smaller ones.' I says: 'Who is the president of this company?' 'Why,' he says, 'the president is E. E. Lasswell, of Lewiston, Idaho.' And I says, 'What is his business?' 'Why,' he says, 'he is a competent man, he is a banker, he is connected with a bank, at Lewiston, Idaho.' And then I asked him again, I says, 'How much stock have you sold in this company?' 'Well, it wasn't to exceed $20,000.' I asked him then how he was investing his money. 'Oh,' he says, 'on building and loan, just the same as any other building and loan does; we are loaning money and take first mortgage for it, in prosperous cities in Montana.' He mentioned two or three cities; I don't just recall the particular places, one was Missoula, and Helena; it was Missoula and Great Falls, and some others he mentioned, that they was investing their money. And I was trying to find out if he had any money invested at that time, but he didn't give me no satisfaction at all. And I says, 'Under what rate do you loan the money?' 'Well, we loan our money at 40 and 60 per cent on valuable property, according to where the property is located.' And I asked him, I says, 'How do you get your return from your money?' 'Why,' he says, 'the loaner, the man that borrows the money, they pay so much a month on the principal and interest, and then we take that same money and loan it out again, and that is the way we are making the money.' And that is about all that I can just recall, that

I can remember at the present time, except as the questions
may be asked me. He told me that E. E. Lasswell was a
banker. I did not know E. E. Lasswell at that time; later on
I found out who E. E. Lasswell was, that she was a stenog-
rapher in the bank, at Lewiston, Idaho. This is all that I can
at the present time recollect about the conversation I had in
regard to this matter at Miles City. I became a director of
this company on that date. When they were talking about the
matter Mr. Woolsey says, 'Well, Mr. Doll, we had all the offices
arranged, they were all picked out, but being you are here,
one of our stockholders, we will put you on as one of the
directors of the building and loan,' which I really believed, at
that time, it was a building and loan. I was put on as one
of the directors, and I served not to exceed one term. I am
not still a director of the company, because I resigned the fore
part of last March.''

The testimony of other witnesses was received in evidence
respecting other stock sales made and subscriptions for such
stock taken by Stone in the year 1923, and of the representa-
tions made by him at the time concerning the Western Home
Improvement Company. From such witnesses it also appears
that the defendant Woolsey called upon them about a year
after their dealings had with Stone, stating to each of them,
in effect, that he was around getting acquainted with the stock-
holders of the company, and endeavoring to interest them in
the purchase of more stock in the corporation. To such persons
Woolsey made statements concerning the Western Home Im-
provement Company, its character, and business methods, sim-
ilar to those theretofore made to them by Stone at the time
he had sold stock to them or secured their subscriptions there-
for. Woolsey said that Stone had represented the company
in 1923 in selling stock, but that Stone was no longer with
the company. Woolsey canceled the subscription contract
made by Mrs. Elsie Wakeham for the purchase of stock in
the corporation to the amount of $500, which she had made
through Stone in 1923. Woolsey said he would make it easy

for her and cancel the $500 contract; and that if she would pay him $50 more he would give her stock certificates from his own holdings to the amount of $200, so that she would not lose the amount she had paid on her stock subscription contract. Thereupon she gave him her check for the sum of $50, payable to his order, and subsequently he delivered to her a certificate for two shares of common stock and a certificate for two shares of preferred stock of the Western Home Improvement Company, issued in her name and dated May 9, 1924. The check appears to have been cashed on Woolsey's indorsement.

Mrs. Belle Wegner, who conducts a confectionery store at Paradise, subscribed for stock in the corporation in May, 1923, placing her subscription with Stone. On August 17, 1924, the defendant Woolsey, as secretary of the corporation, wrote to her from Miles City as follows: "According to our letter to you of August 7, 1923, and your failure to live up to the terms of your written contract, this is to notify you that we have canceled your contract and all moneys paid thereon are forfeited." Later in the month of August, 1924, Woolsey called on her at her place of business and, according to the witness "said if I would buy $200 worth more of his stock, he had $200 worth of his own, he would cancel the former contract, I wouldn't have to take $500 worth, and therefore wouldn't lose the $200 I bought from Stone—and so I bought $200 worth more."

This is a fair summarization of the evidence and the character thereof introduced reflecting upon the defendant's guilt of the crime charged. The prosecution proceeded throughout upon the theory that although the defendant Woolsey did not make the false representations complained of, inducing Mrs. Doll to part with her money in purchase of the stock, yet since he was the secretary of the corporation for which Stone acted in making stock sales and in obtaining stock subscriptions, and had been employed by Woolsey, Woolsey should be held responsible as the principal for Stone's false representations.

The statute upon which the charge is predicated reads, so
[1]    far as applicable: "Every person who knowingly and de-
signedly, by false or fraudulent representation or pretenses,
defrauds any other person of money or property, including evi-
dence of indebtedness, * * * is punishable in the same
manner and to the same extent as for larceny of the money or
property so obtained." (Sec. 11410, Rev. Codes 1921.)

The character of false or fraudulent representation or pre-
tense made a crime by the statute is a misrepresentation of an
existing or past fact, by one who knows it is not true, adapted
to induce the person to whom it is made to part with some-
thing of value. (12 Cal. Jur. 452; 2 Bishop on Criminal Law,
sec. 415; Wharton's Criminal Law, 11th ed., 1594.) The
gravamen of the offense is making a false representation and
thereby obtaining money. (*State* v. *Brantingham,* 66 Mont. 1,
212 Pac. 499.)

In construing and applying this statute, this court in the
case of *State* v. *Bratton,* 56 Mont. 563, 186 Pac. 327, held
correctly: "In order to convict of the crime here charged,
it is necessary that the prosecution allege and prove: (1) The
making by the accused to the person injured, of one or more
representations of past events or existing facts; (2) that such
injured party believed such representations to be true and,
relying thereon, parted with money or property, which was
received by the accused; (3) that such representations were
false; and (4) were made knowingly and designedly, with the
intent to defraud such other person." And in this case the
trial court so instructed the jury as to the law by its instruc-
tion No. 30.   .

It is plain to be seen, upon a review of the evidence, that the
[2, 3]    case must fall by reason of the failure to prove the
making of false representations by the defendant Woolsey to
the prosecutrix as to past events or existing facts. On any
possible theory, the defendant Woolsey could be held crimi-
nally responsible as a principal only upon proof of a con-
spiracy, or evidence that he directed or authorized the misrep-

resentations made by his agent. A conspiracy was not established, nor attempted to be proved; and there is nothing in the record respecting Woolsey's directions given to the agent, Stone, nor as to the scope of Stone's employment, further than to sell and obtain subscriptions for the capital stock of the Western Home Improvement Company. It is true that a year later Woolsey made representations similar to those made by Stone which had induced the complaining witness to part with her money, but the statements made by Woolsey may not be considered as representations as to past or existing facts whereby the complainant was induced to part with her money. When Woolsey spoke, the complainant had already been injured, not by what Woolsey said to her, but on account of Stone's representations made a year previously. She received her stock certificates before she ever met Woolsey, and she did not claim that he ever made any statements to her respecting the company until after she had purchased the stock and the same had been delivered to her, and she states that she did not pay out any money on account of any representations made by him. There is nothing in the record to show that the defendant Woolsey attempted to sell any stock to the prosecutrix, or that he made any representations intended to induce the purchase of such stock prior to April, 1924. There is no showing whatever that the defendant Woolsey ever made any statements concerning the stock or its value, true or false, for the purpose of inducing the purchase thereof prior to April, 1924, more than a year after the first dealings had by Stone with the complaining witness, and long subsequent to the dates charged in the information. All the money paid was to Stone, and the prosecutrix did not know whether he had ever sent any of it to Woolsey, further than from Stone's statement made to her to that effect. She knew nothing about it except what Stone told her. She subscribed for the stock and paid therefor between March and July, 1923. She dealt with Stone alone and did not meet Woolsey until April, 1924, long after she had parted with her money. There is no showing what-

ever as to Stone's authority as the agent of Woolsey or of the corporation; no evidence as to any conversation, or agreement, had between them before Stone embarked in making stock sales; and no testimony as to what, if any, directions were given Stone by Woolsey respecting the value of the stock, its character, or the nature of representations Stone should make to intending purchasers, and there is no evidence that Woolsey ever received the money, or personally profited by Stone's operations, nor is there any proof that Woolsey prepared or authorized the use of the stock subscription blanks by Stone.

If the verdict is to be upheld, it can only be upon the theory that Woolsey is criminally responsible for the representations made by Stone to the prosecutrix as the agent of the defendant Woolsey. The master or principal cannot be held criminally liable for the unlawful representations or acts of his agent or servant, though committed in connection with the master's business, unless it appears that the master directed the agent or knowingly assented to or acquiesced in the agent's acts or representations. (*Grant Bros. Const. Co.* v. *United States,* 13 Ariz. 388, 114 Pac. 955.) The civil doctrine that a principal is bound by the acts of his agent within the scope of the agent's authority has no application to criminal law. (1 McLain, Crim. Law, sec. 188.) While false pretenses may be made to an agent of a person defrauded, yet, when made by an agent, they must be directly authorized or consented to in order to hold the principal, for authority to do a criminal act will never be presumed. (1 McLain, Crim. Law, sec. 683; *People* v. *Green,* 22 Cal. App. 45, 133 Pac. 334.)

In 16 C. J. 123, the law applicable is well stated by the author as follows: ''The civil doctrine that a principal is bound by the acts of his agent within the scope of the agent's authority has no application to criminal law. Therefore the mere relation of principal and agent, or of master and servant, does not render the principal or master criminally liable for the acts of his agent or servant, although done in the course of his employment; it must be shown that they were directed or authorized by him. Moreover, a clear case must be shown. Ratifica-

tion of an unauthorized act of an agent will not render the principal criminally liable for the act, although the ratification makes him civilly liable.''

From a review of the evidence, there is no doubt in the minds of the court but what those who dealt with the Western Home Improvement Company were swindled out of their money, nor that the defendant Woolsey was not free from culpability; however, in view of the charge and the testimony introduced in support thereof, the verdict cannot legally be permitted to stand. The principle involved is far reaching in effect, and, no matter what may be our surmises respecting the defendant's guilt, we are compelled to impartially declare and apply the law.

A conviction for crime may not be based upon conjecture [4] or probabilities. There must be sufficient competent evidence to sustain the charge before a conviction can be sustained on appeal. (*State* v. *Taylor,* 51 Mont. 387, 153 Pac. 275; *State* v. *Riggs,* 61 Mont. 25, 201 Pac. 272.)

In *State* v. *Riggs,* supra, this court said: ''We are committed to the doctrine that 'a defendant may not be convicted on conjecture, however shrewd, on suspicion, however * * * strong, but only on evidence which establishes his guilt beyond a reasonable doubt; that is upon proof such as to logically compel the conviction that the charge is true,'' many of this court's decisions on the subject being there collected. Suspicion, however well founded, that the defendant is guilty of the offense with which he is charged does not justify a conviction. (*State* v. *Brower,* 55 Mont. 349, 177 Pac. 241.)

We are not unmindful that we are limited in our review to an examination of the record to determine whether there is any substantial evidence to justify the verdict. (*State* v. *Popa,* 56 Mont. 587, 185 Pac. 1114; *State* v. *Riggs,* supra.) But where, as in the case before us, the evidence is unsubstantial and speculative, it becomes our duty without hesitancy to set the verdict aside. (*State* v. *Riggs,* supra.) Presumably the state introduced all the evidence it had in support of the charge, and at the conclusion of all the evidence submitted by the

prosecution the defendant moved the court to direct the jury to acquit him, which motion was denied. He thereupon rested on the state's case without introducing any evidence in defense. The entire case was made by the prosecution and submitted by both the state and the defendant. From a careful review of all of the evidence, we are of opinion that the court erred in not directing a verdict.

For the reasons stated the cause is reversed and remanded, with directions that the case be dismissed as to the defendant Woolsey, and that he be discharged.

<em>Reversed and remanded.</em>

Mr. Chief Justice Callaway and Associate Justices Myers, Stark and Matthews concur.