STATE, Respondent, *v.* LUND, Appellant.

(No. 7,004.)

(Submitted September 24, 1932.   Decided December 23, 1932.)

[18 Pac. (2d) 603.]

*Mr. T. J. Davis,* for Appellant, submitted a brief and argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. T. H. MacDonald,* Assistant Attorney General, for the State, submitted a brief; *Mr. MacDonald* argued the cause orally.

HONORABLE JOHN HURLY, District Judge, sitting in place of MR. JUSTICE FORD, disqualified, delivered the opinion of the court.

The defendant was brought to trial and found guilty upon an information charging him with grand larceny, in that he wilfully, unlawfully and feloniously appropriated to his own

use a certificate of stock in the Western Loan & Building Company (hereafter referred to as the Western Loan), of Salt Lake City, Utah, of the value of $2,262.06, the personal property of Hilma A. Gardner, etc.

When the case was called for trial, the state asked leave to amend the information by adding the words, "as a bailee, agent, trustee, and as an officer of a corporation, and as a person authorized by agreement or by competent authority to hold, or take possession, custody, or control." Upon objection the motion was denied.

Prior to the trial upon the merits, the defendant moved for a change of place of trial, which motion was denied.

Hilma Gardner, the owner of the certificate, the larceny of which is the basis of the charge, was then sworn and testified that she is a resident of Helena; that she was and had been for several years the owner of a stock certificate in the Western Loan, which certificate was dated the eleventh day of September, 1920, and contained stipulations to the effect that, if Hilma Gardner should make certain monthly payments, upon its maturity the corporation would pay to her the sum of $3,000. She testified that she had made the payments thereon for several years to a Mr. Riedman as agent for the Western Loan, whom she had known for over thirteen years, and that she had bought the certificate through him; that in the month of May, 1929, the defendant Earl Lund, Erwin Lund and Mr. Riedman came to the home of the witness and her husband, and that Earl Lund asked if he could "have and borrow the certificate for his business"; that defendant said she could have the certificate at any time she wanted, and that she thought "it was the same as his father down in Salt Lake. * * * I asked him if I could get it back any time I wanted to, and he said I could have it any time I wanted it"; that he was to give her interest on the money if she let him have the certificate; and that upon the next day Mr. Riedman and defendant brought her the certificate. Her husband was also present. Thereupon Mr. Riedman handed her the certificate for indorsement, and she indorsed it without looking at it.

After doing so, she gave it to the defendant, saying: "I don't need my money for one year or two, but I will want my certificate when it is due, and he said I could have it any time I called for it. \* \* \* You asked me to state who was authorized, if anybody was authorized, to take that certificate and get the money from the Western Loan—Mr. Lund was the only one. I did not expect him to cash in the certificate and I did not authorize him to cash it in, not until about a year after when I found the certificate had been cashed." She understood he was organizing a new company at this time, and that his father, assistant secretary of the Western Loan, was behind it. "They described this new company to make it appear to me that it was the same thing as the old company; as going into another branch of the Western Loan."

The assignment of the certificate indicates that it was made in blank, and that afterward the names of Crowley & Thomas of Salt Lake City were written in as indorsees, and that they cashed the same and delivered the proceeds, amounting to $2,262.06, to the Great Western Bond & Mortgage Company (hereafter referred to as the Great Western).

Mrs. Gardner further testified that Mr. Lund was to pay her interest, "as to what interest he would pay, between seven —I know it was seven per cent., but I am not sure how much more."

Upon cross-examination she stated that she did not have the certificate at home at the time the three parties called upon her, but that her husband got it from the bank, and she was positive that she gave it to the defendant on the twenty-ninth day of May; that she signed the indorsement in her home on that day in the presence of Riedman and defendant, without reading it, though she had opportunity to do so, *and that she signed no other papers at the time;* that Mr. Riedman asked her to "please sign the certificate"; that she did not ask him any questions; and that he made no further statements. Later on she testified that this and other certificates, likewise assigned, were to be used for the purpose "of releasing other capital or money; they said that to me too.

In other words they would take this certificate and use it in such a way as to release other assets that would earn money so that I could be paid some interest.'' She further testified that she did not know that she had purchased stock from Mr. Lund in the Great Western; that she did not have any certificate issued by that company in her possession, though she later testified that she did have in her possession such certificates of stock, which stock is referred to in the testimony as ''interim'' certificates in the Great Western. The witness then identified a certificate dated May 29, 1929, issued to her by the Great Western, reciting that the witness is a subscriber for certain shares of the capital stock of the Great Western; and that upon payment of the subscription price in full as specified in the application ''hereby referred to and made a part hereof, proper certificates will be issued and furnished the subscriber.'' She stated she did not recall the date she got the certificate and was not in Helena when it was received. ''That was not the same transaction of May 29th when I purchased stock of the Great Western. * * * I didn't get that that same day. My husband took care of that and put it in a safety box because I was not here''; that the first time she saw Mr. Lund was when he and his brother and Mr. Riedman came to her home. ''They were together, not the 29th but the 28th.''

She stated that she did not recall receiving any letters from ·the Great Western at the time she purchased stock in the company acknowledging receipt of her subscription; that she thought Mr. Lund was borrowing the certificate, and did not understand she would receive a dividend upon stock purchased in that company, and that what she thought she was doing was lending this certificate, and that Mr. Lund was to pay her seven per cent. for it, and that she did not read the certificate which came to her from the Great Western; thought it was the same as the one which she had, possibly in the nature of a receipt. She admitted that on November 24, 1929, she had her daughter write to the company under her direction, though she did not actually read the letter, at a time when

the witness was sick, a letter referring to investment in the Great Western.

She received dividends on her Great Western stock from time to time and these dividends came in checks which she cashed after indorsing; her husband likewise received similar checks, but she thought the checks were for the use of her stock in the Western Loan.

She further testified that she had no transactions with the Great Western, other than the transaction in which she handed him three certificates of the Western Loan on the twenty-ninth day of May; that "they" were to invest the certificates and get her a profit, and that she understood the investment was to be with the Western Loan, and "they" did not say the Great Western would pay a profit for the investment of her certificates, "they said they were going to pay it, Mr. Lund"; that she did not believe Mr. Lund and Mr. Riedman were going to invest the certificates; that "Mr. Lund did not say what the name of the branch was in which he would invest her certificates"; that they simply told her they wanted her certificates, had her sign them, and "they" would take them and invest them with the Western Loan so they would bring her a profit of at least seven per cent.; that she authorized Mr. Lund to take the certificates and invest them in the Western Loan so she would make a profit upon them.

From the defendant's testimony it appeared that at or about the time of the transfer of Mrs. Gardner's certificate she signed a written subscription for stock in the Great Western, and that attached thereto is a promissory note executed by Mrs. Gardner to the corporation in the sum of $1,208, which read as follows:

"Subscription for Great Western Bond & Mortgage Corporation Units Consist of One Preferred Share and Three Common Shares

"$2,990.00                    Helena Montana May 28 1929
                                      (City and Date)

"I, Hilma Gardner hereby subscribe for 26 shares of preferred stock, and 78 shares of A common stock of the Great

Western Bond and Mortgage Corporation, and agree to pay $100.00 per share for preferred stock and $5.00 per share for common stock as follows: Seventeen Hundred Eighty Two Dollars ($1,782.00) accompanying this subscription and the balance of Twelve Hundred Eight—thereof as evidenced by promissory note of even date herewith.

"It is understood and agreed this certain stock shall remain the property of the corporation, until the full amount of the subscription has been fully paid in the manner and at the time herein provided, it being expressly understood that time is the essence of this agreement.

"I have read the foregoing subscription and know the contents thereof, and agree that no statements, representations, or promises not contained herein shall bind the corporation.

"HILMA GARDNER   Subscriber

"144 Henry Street

"Helena, Montana   City and State

"G. W. RIEDMAN Witness

"$1,208.00                                        May 28, 1929

"For value received, I promise to pay to the Great Western Bond and Mortgage Corporation or order, at Los Angeles, California, the sum of Twelve Hundred Eight Dollars, together with interest at the rate of 7 per cent per annum in monthly installments of Seventeen and 03/100 Dollars, and interest, commencing on the 16th day of June, 1929, and on the 16th day of each and every month thereafter until the full amount has been paid.

"Should default be made in any installment when due, then the holder hereof may at its election and without notice declare the entire balance due and payable.   The undersigned agrees to pay reasonable expense of collection.

"HILMA GARDNER."

The defendant testified that the credit of $1,782, shown on the stock subscription, was later increased to $2,262.06, the actual value of the Western Loan stock, which amount was

paid by the Western Loan upon the surrender of Mrs. Gardner's certificate in that company.

For some reason neither the state nor the defense questioned Mrs. Gardner concerning her signature upon the stock subscription or the notes above referred to, except that upon her direct testimony she had said she had signed nothing but the assignment of her certificates, nor, after they became a part of the evidence, was she questioned about the same. Mr. Gardner did not testify.

In order to show somewhat similar transactions on the part of the defendant with persons other than Mrs. Gardner, witnesses were sworn, and, as error is specified upon the reception of all or a part of this testimony, it becomes necessary to narrate the salient features of the same.

Patrick Woods, a merchant in Helena, testified to his acquaintance with the defendant and Mr. Riedman; that he had business transactions with Riedman in August of 1929 when defendant was present. He testified to conversations with Riedman outside of the presence of the defendant, continuing for a period of perhaps a month or more, and that he turned over to Riedman certificates of stock in the Western Loan; that the defendant was present when he agreed to turn the stock over, and that on the date of turning it over he had a conversation with the defendant and Riedman about it. "You ask me to tell you what the deal was; we had been arguing this case, and I insisted they could not pay me 13%. Starting again, where the 13% entered in, by letting them have the certificates in the Western Loan * * * Mr. Lund says we are not paying you 13%, but are only paying you 7% and the Western Loan * * * is paying 6%. We will pay you 7% semi-annually in cash if this stock is put up as collateral with the state to release cash bond they had up. They would in turn pay 7% for the cash release. I wouldn't give up my certificate until I was sure I was getting interest for the cash that he would get. My certificates would still remain and I could have them back any time within ten days' notice. * * * They wanted these certificates

to put up as collateral with the state to release cash; as to whether they told me anything about the cash, or where it was, they said 'with the state,' and I was under the impression it was Utah. * * * Only I was under the impression it was a new concern and a subsidiary of the Western Loan. * * * I understood they were practically the same and I supposed, from the fact that defendant's father was interested, I knew he was connected with the Western Loan * * * and felt perfectly satisfied as long as they were all in, and so when they told me my certificates would mature right where they were and at any time I could have them back, if I was dissatisfied I could have them * * * When I signed the paper I was taking the chance if the company went wrong and the state collected the collateral of course I would lose it all. When they promised to pay 6% in addition that looked like a bargain to me. They promised to pay me 7% for the use of the certificate to release the cash they had up with the state and that was to come to me semi-annually. * * * My regular interest that was to accumulate to mature the contract with the Western Loan * * * which was to accumulate at 6% to mature the contract. It was to remain with the Western Loan. * * * to mature the contract.''

The witness had already pledged his stock in the Western Loan at a bank to secure a note for $3,500, and the defendant loaned him the money to pay that indebtedness, and several days later he turned his Western Loan certificates over to Riedman, after the money to pay the loan at the bank had been sent. This witness also received checks, on some of which were printed the words ''dividend voucher,'' from the Great Western from time to time, which he indorsed and sent back to the Great Western to apply upon the monthly payments. He identified certain certificates, in the same form as the so-called interim certificates referred to in the testimony of Mrs. Gardner, which he received in the mail and placed in his safety deposit box. This witness received a pass-book from the Great Western in which he was given credits to apply

upon his purchase of stock and in which was placed from time to time a statement of the various payments made by him upon his subscription to the Great Western. It further appeared that he made later loans upon his Great Western stock and received from the Great Western in loans, in addition to the money which he paid to the bank, the sum of $1,000 at one time and $960 at another.

Mrs. Sara E. Morse likewise testified to transactions she had with Mr. Riedman and the defendant, from which it appears that she surrendered to Riedman stock in the Western Loan having a present value of over $12,000, and a maturity value of approximately $24,000, for which she received interim certificates in the Great Western; that she likewise signed promissory notes and stock subscriptions to the Great Western on August 1, 1929. She testified positively that she had no thought of surrendering her stock in the Western Loan, and that she expected to receive thirteen per cent. upon her stock by loaning it, and that she never had any intention of disposing of her stock in the Western Loan. However, it appears that later Mrs. Morse wrote several letters to and for the corporation, indorsing its activities and indicating her stock ownership. For instance, on July 8, 1930, she wrote: "Thanks for the check for $412.48, which has just reached me. It is indeed fine to have this amount coming in from my stock with you." On March 14, 1930, she wrote the Great Western as follows: "It may please you to know that I have investigated your corporation * * * I am entirely convinced through my investigation that I have made an excellent investment with your corporation and I would consider it a personal pleasure and a favor to my friends and acquaintances to tell them of your investments. * * * I might also state that the above statements are made as a result of my investigations and not from a personal standpoint."

Again, on April 18, 1930, she wrote to a private individual a letter highly lauding the activities of the Great Western and stating that she had made investment therein.

The testimony of A. G. Bussard is much to the same effect as that of the other witnesses. He testified that some time after assigning his certificates in the Western Loan he learned he was a stockholder in the Great Western and did not make any objection to that relation, stating: "I could not, I had already transferred the stock. I suppose I signed a subscription blank subscribing for some stock in the Great Western."

A letter written by this witness to the Great Western, under date of May 24, 1929, reads as follows: "This will acknowledge receipt of your favor of recent date enclosing my stock certificates in the sum of $20,000.00.

"I take this opportunity to express my appreciation in being allowed to use my Western Loan and Building Co. saving certificates in payment of stock with your corporation.

"I feel confident that I have made an excellent investment and am indeed thankful for the opportunity; my only regret is that I am not at this time able to increase my holdings."

Mrs. Sarah M. Huffaker, for the state, testified much to the same general effect as to the transfer of her stock in the Western Loan and as to representations made to her by Riedman and the defendant, though she admitted some confusion as to whether she talked with defendant or his brother. She testified that she did not know about subscribing for stock in the Great Western, though she signed some papers, from which it appears that she signed stock subscriptions and notes to the Great Western and received interim certificates; and likewise received dividend checks from the Great Western.

The defendant in his own behalf testified that in May, 1929, he was twenty-seven years of age, a resident of Los Angeles, California, and was president of the Great Western, that its financial management was under his supervision and direction, and that the company had been authorized to solicit stock subscriptions in Montana and four other states. He identified various stock subscriptions and promissory notes, signed by the state's witnesses, including Mrs. Gardner, which have been referred to heretofore as having been received by his company; testified that George Riedman, referred to in

the state's testimony, was employed by his company to sell capital stock of the corporation and for no other purpose; that he had been in and around Helena almost continuously since the first part of 1929; that, however, he (the defendant) was not in Helena on the 29th of May, 1929, but had left the state on the 28th, arriving at Salt Lake in the early morning of the following day. (At this time the state admitted that the defendant was in Salt Lake on the 29th of May, 1929, thus showing that Mrs. Gardner was mistaken as to the date when she said the defendant called upon her.) He admitted that he called upon Mr. and Mrs. Gardner on May 27th, and stated that he merely had a social visit, and did not talk over the affairs of the Great Western. There was nothing said as to whether or not the transaction between Riedman and the Great Western had been closed, and that the only statement made was that Mr. Riedman had called and told them about the company. He denied being present and hearing or making the representations narrated by Mrs. Gardner. He testified that Riedman had no authority to state to any prospective purchasers in his company that, if they turned in their Western Loan certificates, they would not be cashed or transferred. He had never met Mrs. Huffaker until July of 1931, had never met her in her home or had any conversation with her there, but that he believed that his brother Erwin talked to her some time in the latter part of 1929. The defendant then explained that Riedman was furnished subscription forms prepared by the corporation, and instructed to sell the stock for cash or its equivalent, to be applied as a credit on the purchase of stock in the Great Western, and that Riedman was instructed to take in part payment upon subscriptions Western Loan certificates at their cash or market value. He denied categorically that any of the state's witnesses had said to him that they had not intended to transfer their certificates in the Western Loan to his company, or that he had ever said to any witness that the certificates in the Western Loan would be pledged as collateral for the release of cash. He further stated that the first time he saw the Gardner certificates

in the Western Loan was when they were received in Salt Lake where his company had a branch office. He stated that the assets of the Great Western in 1929 consisted of the control of the stock in the Southern California Investment Corporation and of stock subscription contracts from investors; that the assets of the latter corporation were the ownership and rentals from the Sherwood Apartment in Los Angeles, a five-story apartment, brick building, comprising seventy-two apartments, having an income from rentals of $55,000 annually at the time he purchased the apartment, later reduced to $26,000. The property was purchased subject to a mortgage which defendant assumed in the sum of $170,000, payable to the Western Loan, and that his company in all has paid $90,000 in principal and interest upon this mortgage, leaving a balance at the time of trial of about $134,000 owing, and that the mortgage was being foreclosed at the time of trial.

It is apparent from the reading of the testimony that at the beginning of operations the defendant and his corporation intended to approach certificate holders in the Western Loan and obtain indorsements of their certificates where possible to apply upon stock subscriptions in the new company, and that he donated $15,000 to the Great Western to be carried as a surplus account for the payment of dividends, out of which the dividends were paid Mrs. Gardner and others. This transfer, or donation, was made May 3, 1929, but was shown on the company books as of date July 27, 1931.

For some reason neither the state nor the defendant developed what equity there was in the apartment house, nor what was paid for it by the defendant, over and above the mortgage. This subject was approached at various times by counsel on each side, and then not fully pursued.

The state offered in evidence certain exhibits which seem to have been portions of a pamphlet issued for advertising purposes by the Great Western, and the portions offered in evidence read as follows:

"Our successful operation is very well demonstrated by the dividend check enclosed herewith, and we pause for a moment

to state it is a great pleasure for the Board of Directors to turn from the regular routine of business at this time of the year to make an even distribution and division of the company's profits to their many friends and stockholders. It is needless to say that the untiring efforts of the personnel of this great institution is to consistently and safely, through their many years of experience, earn for their stockholders the largest returns possible on their investments.

"We are pleased to report that the company's quarterly statement, with its affiliated company, shows an Authorized Capital and Surplus of $6,255,800.09. This very creditable sum is made up of paid in capital, cash on hand and in banks, real estate owned, loans, accounts receivable, investments, and surplus."

The actual amounts of capital stock subscribed for and issued was far less than that authorized, and the statement shows materially more assets than does the report to the state auditor.

At the outset it should be observed that the information on which the defendant was tried charged him merely with grand larceny, that is, the actual theft of the certificate of stock in the Western Loan, the theory of the state being that such theft was accomplished by deceit and artifice on the part of the defendant, and that if such deceit and artifice had not been practiced, Mrs. Gardner would not have parted with the certificate, and that the defendant is guilty, whether the actual larceny was perpetrated by him or by his corporation.

We have narrated in considerable detail the facts surrounding the surrender of her certificate by Mrs. Gardner. Study of the transcript leads to no other conclusion than that Mrs. Gardner, her husband, and all other persons who testified to turning over their stock in the Western Loan to defendant's corporation, or to persons acting as agents for the same or for the defendant, knew that they were parting with title thereto, making a new investment, and getting credit for their Western Loan in the purchase of stock in the Great Western; that Mrs. Gardner knew this is apparent from the giving of the stock subscription and promissory note for purchase of

stock in the Great Western, unexplained by the state, the letter of her daughter written to Mr. Riedman inquiring about the "investment," the receipt of dividend checks from time to time, and the cashing of such checks by Mrs. Gardner. The testimony of transactions involving the stock of other persons, as that of Mr. Woods, Mr. Bussard, Mrs. Morse, and Mrs. Huffaker, while none of it was based upon exactly similar representations, shows that each and all treated themselves as investors in the Great Western, as do the letters of indorsement of Mr. Bussard and Mrs. Morse, and no fairminded person reading the record on appeal can come to any other conclusion than that they knowingly parted with their certificates in the belief that they were improving their financial situation by making the new investment.

Deplorable as the situation eventually developed, in which these persons surrendered a sound investment in the Western Loan for a "will-o'-the-wisp" in the new corporation, it cannot be concluded other than that they each and all did so with the knowledge that they were disposing of their stock and making an investment which they believed would bring them larger returns. That the situation subsequently disclosed they had made a bad investment, and that the defendant and his corporation were guilty of bad faith and fraud, does not change the primary fact that they knowingly parted with their stock.

Whatever interpretation the several witnesses may place upon things said and done—and no aspersion is to be cast upon their integrity as witnesses—they parted with the legal title to their stock; we may concede that they drew the wrong legal conclusion as to the effect of their words and acts, but the fact remains: They knew, or must be held to have known, that they actually parted with title. The "silent witnesses" in the written statements of each and all of the parties who made the unfortunate investments, including their subscriptions for stock, promissory notes given by them, etc., refute any other idea.

A review of the evidence shows beyond doubt that this defendant was guilty of gross fraud in the management of the corporation so far as Mrs. Gardner and the other witnesses were concerned. Defendant caused the Great Western to pay dividends which were not earned by substitution of funds of another corporation, or as the defendant states, by a "donation." That this was done to deceive Mrs. Gardner and others similarly situated as to the soundness of the Great Western is without question, and as palpable are the statements contained in the advertising literature of the corporation as to its capital and assets. Other facts already narrated impugn the good faith and integrity of the defendant in the management of the corporation. With these acts we have nothing to do except as they relate to the actual charge of larceny of Mrs. Gardner's certificate. That the defendant may or may not have been guilty of other offenses is not for us to decide.

As has been said before by this court: "A conviction * * * may not be based upon conjecture or probabilities. There must be sufficient competent evidence to sustain the charge before a conviction can be sustained on appeal." (*State* v. *Woolsey,* 80 Mont. 141, 259 Pac. 826, 833, and cases cited.)

The contention of the defendant that the admission of the oral testimony concerning negotiations relating to the transfer of Western Loan stock was in conflict with the writings, and therefore a violation of the parol evidence rule, we think needs no extended discussion. As to Mrs. Gardner, who merely stated she signed nothing except the transfer of her stock and who was not called upon at any time to admit, deny or explain her signature, the effect of which was at variance with her oral testimony, there is absolutely nothing in the record, prior to the time when the defendant, on his examination produced and offered the papers signed by her, to show that she ever did sign them, or that any contract existed. Had the papers been forgeries, it is inconceivable that the state would not have shown the fact. It would be extending the rule with regard to parol testimony far beyond its accepted interpretation to say that in case of fraud the state

may not, in proper cases, show by parol facts to negative the existence of the alleged contract. (Sec. 7531, Rev. Codes 1921; *People* v. *Kelley,* 81 Cal. App. 398, 253 Pac. 773; *People* v. *Robinson,* 107 Cal. App. 211, 290 Pac. 470; *People* v. *Martin,* 102 Cal. 558, 566, 36 Pac. 952.) Besides, the written subscription and notes do not in any way disclose the nature of the consideration or credit given Mrs. Gardner, and the only document referring in any way to the stock in the Western Loan is an order on the Western Loan, signed by Mrs. Gardner and others similarly situated. (See, also, section 10606, Rev. Codes 1921.) How the credit of $1,782, given Mrs. Gardner, for instance, in the stock subscription, was in fact some $480.06 greater is an illustration of what either state or defendant might be deprived of proving, if a hard-and-fast rule, such as that contended for by the defendant, were followed. In addition to this, the assignments, as signed, were in blank, and the certificates in the Western Loan were surrendered and cashed by persons not known or mentioned to the witnesses.

The testimony of Clarence Neslin, vice-president of the ■ Western Loan, was objected to in almost its entirety. He produced certain records of his company, including stock certificates issued by it, including those of Mrs. Gardner and other witnesses for the state, which had been assigned, and showed the amounts paid upon the surrender value. The objection was that the witness had not shown himself sufficiently informed to testify concerning the accounts of his corporation. We think he was qualified. (*State* v. *Cassill,* 70 Mont. 433, 277 Pac. 49; *State* v. *Smart,* 81 Mont. 145, 262 Pac. 158.)

Vigorous objections were made to any witness for the state ■■ narrating conversations had with Riedman, the agent of the Great Western, in the absence of the defendant, with relation to the transfer of stock certificates owned by the witnesses in the Western Loan, and the uses and purposes to which the stock assigned by them in blank was to be put after its delivery to Riedman.

The rule is well recognized that ordinarily statements by a third party, not a co-conspirator, may not be received in evidence against a defendant (*State* v. *Hopkins*, 68 Mont. 504, 219 Pac. 1106), and that a defendant may not be held criminally liable for acts of his agent, where the agent is not acting under his express authorization. (*State* v. *Woolsey*, supra.)

In the latter case, the defendant was convicted of obtaining money by means of false representations, and it appeared that the representations on which the state relied were made in large part outside the hearing and presence of the defendant, without a showing that the agent was authorized to make the statements; and it was contended that the defendant, by accepting the benefits obtained by means thereof, had himself become guilty of making false representations. On appeal, the court said: ''The master or principal cannot be held criminally liable for the unlawful representations * * * of his agent or servant, though committed in connection with the master's business, unless it appears that the master directed the agent or knowingly assented to or acquiesced in the agent's acts or representations.''

Ordinarily, in a criminal case, testimony is admissible against a defendant in regard to other similar offenses; and that the testimony regarding the same does not disclose exact similarity does not necessarily make it incompetent, so long as the similarity shows a more or less common purpose or intent with relation to the offense alleged in the information. (*State* v. *Hall*, 45 Mont. 498, 125 Pac. 639.)

For the reasons hereinafter expressed as to a variance between the nature of the crime alleged and the proof offered in support thereof, the testimony of Riedman should not have been received in support of the crime charged, as it tended to show the commission of a crime other than that alleged, and ''a party cannot be convicted of one offense upon an information which charges a distinct and unrelated crime.'' (*State* v. *Wallin*, 60 Mont. 332, 199 Pac. 285, 288.)

Defendant objected to the admission in evidence of Exhibit 63, a letter written by defendant's brother. Inasmuch as

no knowledge of the writing of this letter by the defendant is shown, we think its admission was error.

Prior to the commencement of the trial, a motion for a change of place of trial was made, and evidence was presented in support of, and in opposition to, the motion. The testimony is set forth at length in the bill of exceptions. It presented a conflict, and the court decided against granting the motion. We have examined the testimony, and we cannot say that the motion should have been granted. Such motion is addressed to the sound legal discretion of the trial court, and its decision, though based upon conflicting testimony, will not be disturbed on appeal, unless it clearly appears that the court abused its discretion. (*Torstenson* v. *Independent Pub. Co.*, 86 Mont. 163, 282 Pac. 861, and cases there cited.)

This court, many years ago in *State* v. *Dickinson*, 21 Mont. 525, 55 Pac. 539, held that under provisions of the Code, relating to larceny which have not been amended since, one may not be convicted of larceny in the nature of a common theft, where the charge is larceny by means of false representations, and expressly approved the rule laid down in *People* v. *Dumar*, 106 N. Y. 502, 13 N. E. 325, that, when the indictment or information charges common theft, a defendant may not be convicted of larceny by means of false pretenses. This court held, speaking through Mr. Justice Hunt, that in either case, if the proof established the one of these offenses not alleged in the information, there is a variance between the information and proof.

The writings, including letters of certain of the witnesses, negative the effect of their oral testimony as to the particular crime charged so positively as to constitute a failure of proof as to that offense.

The testimony does not show a taking or trespass against the will of the owner, as referred to in *State* v. *Dickinson*, supra, and *People* v. *Dumar*, cited therein, but tends to show another offense. There was, therefore, a fatal variance between the offense upon which the defendant was brought to trial and the proof offered to support it. The defendant is entitled to

his discharge under the present information, because of this fatal variance. We do not overlook the provisions of section 12034, Revised Codes of 1921, but the applicability of that section to the present situation is not before us for decision.

We have examined all other specifications of error, but do not deem it necessary to discuss them further.

The judgment is reversed and the cause remanded to the district court of Lewis and Clark county, with directions to dismiss the information and to discharge the defendant from custody thereunder.

MR. CHIEF JUSTICE CALLAWAY, ASSOCIATE JUSTICES ANGST-MAN and MATTHEWS and HONORABLE JEREMIAH J. LYNCH, District Judge, sitting in the place of MR. JUSTICE GALEN, disqualified, concur.

Rehearing denied February 8, 1933.