STATE, RESPONDENT, v. BROWER, APPELLANT.

(No. 4,277.)

(Submitted December 2, 1918.   Decided December 16, 1918.)

[177 Pac. 241.]

*Criminal Law — Burglary — Circumstantial Evidence—Insufficiency.*

Criminal Law—Evidence—Suspicions of Guilt Insufficient.
  1.   Suspicion, however well founded, that defendant is guilty of the crime for the commission of which he is being tried, does not justify a conviction.

Same—Circumstantial Evidence—Sufficiency—Rule.
  2.   Where circumstantial evidence is relied on to convict of crime, the circumstances proved must be consistent with each other and so clearly justify the conclusions of guilt that they exclude any other rational hypothesis.

  [As to circumstantial evidence, see notes in 62 Am. Dec. 179; 97 Am. St. Rep. 771.]

Same—Burglary—Circumstantial Evidence—Insufficiency.
  3.   Evidence, wholly circumstantial in character, *held* insufficient, under the above rules, to warrant defendant's conviction of the crime of burglary in the night-time.

*Appeal from District Court of Hill County; W. B. Rhoades, Judge.*

OVA BROWER, convicted of burglary in the first degree, appeals from the judgment of conviction and an order denying his motion for a new trial.

*Messrs. Donnelly & Carleton,* for Appellant, submitted an original brief and one in reply to that of the State; *Mr. Joseph P. Donnelly* argued the cause orally.

*Mr. S. C. Ford,* Attorney General, and *Mr. Frank Woody,* Assistant Attorney General, for the State, submitted a brief; *Mr. Woody* argued the cause orally.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

The defendant was convicted by the district court of Hill county of burglary in the first degree and has appealed from

the judgment and an order denying him a new trial. Counsel assail the validity of the judgment on the ground that the evidence is insufficient to justify the verdict.

The evidence is entirely circumstantial. N. P. Daly resides on a farm owned by him near the village of Simpson, in the northern part of Hill county, within ten or twelve miles of the Canadian boundary. Some weeks prior to February 9 of this year, he left his place and went on a visit to the state of Iowa, intrusting the care of his stock, *etc.*, to Harry H. Smith, a neighbor who resided about three-fourths of a mile away. During the afternoon of February 9 Smith had been to Simpson. Upon returning home about 9 or 9:30 o'clock in the evening, he suspected, for some reason which he does not disclose in his testimony, that something was wrong at the Daly barn. He took his rifle and went over to investigate. As he drew near the barn he saw a flashlight, or a light from burning matches, in the barn. He also saw a strange team of work horses hitched to a sled standing in the barnyard. This team was afterward identified as belonging to the defendant. He shouted, whereupon he was fired upon eight or ten times from the doorway of the barn, the flashes being apparently from two guns about three feet apart. He fired three shots in return. The evening was dark and foggy. He did not see anyone in the barn, nor did he see anyone leave it. He could not say whether there was one or more persons in the barn. After he had fired the three shots, the fire from the barn suddenly ceased. He thereupon went and notified four neighbors who resided in the vicinity, the home of the nearest being about a mile away. When he and they reached the barn, which they did about 11 o'clock, they found a young man named Bennett Wynne lying dead in the barn near the door. Nothing was disturbed by anyone, Smith and the neighbors who were with him keeping watch until the arrival of the sheriff and coroner on the following afternoon, these officers having in the meantime been informed of what had occurred. From the testimony of Smith and the

several witnesses introduced by the state, we gather the following account of what was discovered on the next morning:

There was a wagon-box on the sled. In this were found nine sacks of wheat. Some of these sacks were marked with the name of the defendant. With them was a double set of harness. On the floor of the box was a lantern and a pair of mittens, the latter being partially covered with chaff. These mittens were identified as the property of Wynne. A second set of harness was found outside the barn near the door. Immediately inside the door was a third set of harness on which the body of Wynne was lying. Under the body was another pair of mittens; these were identified as belonging to the defendant. A 38-caliber revolver was found lying near the body, containing empty shells. On the body was a cartridge belt in which there was a single 38 cartridge. Outside of the door on the ground was found one 32 cartridge and one empty shell of the same caliber. The team hitched to the sled was recognized as belonging to the defendant. There was considerable snow on the ground. Early in the night this had thawed somewhat but later had frozen. The tracks made by the sled had come from the north. The person or persons driving the team had first passed a place a short distance north of the Daly place which is referred to by the witnesses as the McConville place. The team had been turned around in the road after passing this place and driven back to a granary belonging to the owner. This place was also unoccupied. The sacks found in the sled had apparently been filled with wheat from this granary before the team was driven to the Daly barn. The McConville place belonged to an uncle of Daly. When Daly left home for Iowa the granary at the McConville place contained a hundred bushels of seed wheat belonging to Daly, and about twenty bushels of flax. When Daly returned on February 12 all this had disappeared. He found that the wheat in the sacks on the sled was the same kind as that stored in the granary and that the sacks, other than those bearing defendant's name, were his, these having been taken from that granary. The tracks of two

persons were found at the granary, those of one of them being small. The defendant had small feet, smaller than the feet of the average man. Some of the witnesses observed the tracks of a man leading from the barn toward the northwest. These were followed by some of the witnesses as far as seventy rods from the barn to a road extending east and west, north of the Daly barn along the line of the section in which the Daly place and the McConville place are both located. These had been made by a man wearing overshoes which were comparatively new, as was apparent from the imprint in the snow of the corrugations on the soles. They could not be traced farther than this road. The person who had made them seemed to be trying to step into the tracks made by the horses hitched to the sled. No one of the witnesses was able to identify these tracks or would express an opinion as to when they were made. One witness said that he thought they were larger than tracks made by defendant's feet. The north and south road leading to the Daly place extends north to defendant's home, which lies about three miles a little west of north from the Daly place. At about 8 o'clock in the evening of February 9, one of the witnesses met the defendant and Wynne six or seven miles north of the Daly place. They were driving south toward defendant's home with a load of hay and a sled which had a second sled tied on behind it. The defendant volunteered the information that he had borrowed the second sled from one Heft, being under the impression in the dark that he was talking to Heft. The sled at Daly's barn was identified as the one defendant had borrowed from Heft. The several sets of harness found at the barn were left hanging in the barn by Daly when he went away, and belonged to him. Prior to February 9 Wynne had been staying at the home of defendant, working for him. He had also made arrangements with the defendant to work for him during the coming season. The witness Chrislock also stayed there up to February 8. While he was there it was common for the men there to wear each other's mittens. One would pick up the first pair he could find and use it. The defendant had a re-

volver, but the witness never examined the caliber of it, supposing it was a No. 38. Wynne had a 32 revolver.

The foregoing is a statement of every circumstance which tends to show that defendant was at the Daly barn on the evening in question. That Wynne was engaged in committing a larceny cannot be doubted. Evidently he had gone first to the McConville place to steal the wheat and then to the Daly barn [1] to obtain the harness by the same means. While many of the circumstances proven tend to incriminate the defendant also, when taken together they go no further than to raise a well-founded suspicion of his guilt. This is not sufficient to meet the requirements of the statute. (Rev. Codes, sec. 8028.) Suspicion, however well founded, does not justify a conviction. (*State* v. *McCarthy*, 36 Mont. 226, 92 Pac. 521; *State* [2] v. *Sieff*, 54 Mont. 165, 168 Pac. 524.) To justify a conclusion of guilt the criminatory circumstances proved must be consistent with each other, and so clearly justify that conclusion that they exclude any other rational hypothesis. (*State* v. *Suitor*, 43 Mont. 31, Ann. Cas. 1912C, 230, 114 Pac. 112; *State* v. *Chevigny*, 48 Mont. 382, 138 Pac. 257; *State* v. *Sieff*, *supra*; *State* v. *Woods*, 54 Mont. 193, 169 Pac. 39.) It is true that defend- [3] ant's team was found at the barn hitched to the sled he had that afternoon borrowed from Heft; that the tracks of two men were found at the McConville granary; that a pair of his mittens was found under the body of Wynne; that Wynne had theretofore been employed by him and lived at his home; that tracks of a man leaving the barn were found going in the direction of defendant's home; and that he had a revolver of the same caliber as that found at the barn. All of these circumstances point to the conclusion that he was at the barn with Wynne, and hence that he was engaged in the larceny with him. When it is recalled, however, that Smith was not able to say that there was more than one person there, that he saw no one leave there, that no one of the witnesses could tell when the tracks leading toward the north were made, that no one could identify them or was willing to say even that they were the

same size as those of defendant, and that it was common for the men in defendant's employ to wear his mittens, the conclusion that he was present is not so necessary as to render irrational the hypothesis that he was not there.  The fact that the evidence tends to show that there were two men at the barn, taken together with all the facts proved, does not render necessary the conclusion that one of them was defendant.  Therefore the evidence was not sufficient to justify the conviction. The case of the state was not in any way aided by the evidence introduced by the defendant.  On the contrary, this evidence tended strongly to show that defendant was not only not present, but that he was at the time on his way to his father's home in Canada, ten or twelve miles north from his own home.  But whether the testimony of himself and his witnesses was to be accepted as credible or not, as we have pointed out above, the evidence adduced by the state was not sufficient to justify the verdict.

It is urged by counsel that the evidence does not show that Daly was the owner of the barn, or that, assuming that defendant was there with Wynne, he did not have the right of entry to it.  There is not any merit in this contention.  The evidence in these particulars was not as definite as it might have been, but it was sufficient to go to the jury.  On another trial the county attorney will doubtless be able to furnish ample evidence to remove any uncertainty in this behalf.

The judgment and order are reversed and the district court is ordered to grant defendant a new trial.

*Reversed and remanded.*

MR. JUSTICE HOLLOWAY and MR. JUSTICE PIGOTT concur.