STATE OF MONTANA, Plaintiff and Respondent, v. EDWARD PESCHON, Defendant and Appellant.

No. 9599.

Submitted January 21, 1957. Decided April 30, 1957.

310 Pac. (2d) 591.

Mr. John D. Gillan, Havre, for appellant.

Mr. Arnold H. Olsen, former Atty. Gen., Mr. Forrest H. Anderson, Atty. Gen., Mr. Louis Forsell, Asst. Atty. Gen., Mr. Bernard W. Thomas, Mr. Charles L. O'Donnell, Jr., County Atty., Chinook, for respondent.

Mr. Gillan and Mr. Forsell argued orally.

HONORABLE JAMES T. SHEA, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, who was absent from the State, delivered the Opinion of the Court.

On January 11, 1955, the county attorney of Blaine County, Montana, filed an information in the district court charging the defendant and appellant, Edward Peschon, with the crime of grand larceny. To this information the defendant entered a plea of not guilty. A trial was had, which resulted in a verdict finding the defendant guilty of grand larceny leaving punishment to be fixed by the court. Upon this verdict there was rendered and entered a judgment against the defendant fixing his punishment at imprisonment in the State Prison for two years. The defendant then moved for a new trial which was by the court denied, and he is now before this court on appeal from the judgment and from the court's order denying him a new trial.

The defendant and appellant predicates error in (1) denying

appellant's motion wherein appellant moved the court to request the jury to bring in a verdict of not guilty; (2) that the verdict is contrary to the law and the evidence; and (3) that the court erred in denying appellant's motion for a new trial.

It appears, inter alia, from the evidence offered and received by the trial court that one Richard E. Walters and his wife came to Chinook from the Art McLeish Ranch sometime during the evening of December 31, 1954. At the time Walters had some fifty dollars in cash and a wage check in the amount of $312.07 which he cashed at the Bar X receiving therefor that amount mostly in twenty dollar bills and some balance in cash. That same day or evening he spent some twenty dollars in Chinook bars and then left for his room in the Chinook Hotel and there went to bed. The next day (New Year's Day) he again commenced to drink, visiting bars in Chinook, the last being the Stockman's Bar. Sometime around 11:00 p. m. of that day, while sitting on a bar stool, he purchased a drink and gave his wallet or billfold to one Katherine Immel, the barmaid, who extracted therefrom a twenty dollar bill and returned to the billfold one five dollar bill and one ten dollar bill, making a total of fifteen dollars and leaving some silver on the bar. She placed the billfold in Walters' righthand shirt pocket and then buttoned the pocket. Walters was intoxicated at the time, in fact, quite drunk. When the barmaid returned Walters' billfold to his shirt pocket and buttoned the pocket, she observed that there were several twenty dollar bills in it, some five or six, in addition to the fifteen dollars which she had returned to it. She further testified there could have been more than five or six twenties in the billfold. Some ten or fifteen minutes thereafter Walters fell asleep at the bar. Apparently he laid his arms on the bar with his head on his arms, and in the parlance of the several witnesses, he "passed out."

During the same evening the defendant had been in and out of the Stockman's Bar "all night." After Walters "passed out" the defendant was observed to pass by and go to the lavatory. When he returned from the lavatory he was observed to

go close to Walters and had been seen to touch both of his "hind pockets" and then to sit down on Walters' righthand side where he remained some ten minutes. During this time the witness, Lee Falcon, called his wife's attention to the defendant because he wanted to "see if she could see what was going on there between the defendant and Walters while he was sitting there." The defendant then got up from the bar stool and walked over to some man then playing some kind of a machine, and this man and the defendant were then observed going to the lavatory where they remained some five minutes and then both came out and both left the Stockman's Bar. At this time the barmaid was requested to ascertain if Walters still had his billfold, and upon search it was found to be missing whereupon the police were notified and they responded to the call in some ten or fifteen minutes. The police then made some preliminary inquiries concerning the reasons for their having been called to the Stockman's Bar and then left, looking for the defendant. Within five minutes thereafter they found the defendant in the Elks Bar. He was with one Gay Sterns. At that time the defendant was seated and Gay Sterns was standing at the bar. The defendant and Sterns were then and there arrested and taken to the city hall. Both men were advised at the city hall they were picked up because they had picked a "guy's" pocket of his billfold. The defendant and Sterns were asked to turn over the contents of their pockets to the police. They did so, and the defendant turned over his billfold and money. At that time he had seven twenty dollar bills, three silver dollars and thirty-five cents in change. No five dollar bill nor ten dollar bill was found in the money which the defendant turned over to the police. At the Elks Bar both the defendant and Sterns had drinks in front of them. During the trial a police officer, Dow Butler, testified as follows:

"Q. At the time these two men, Sterns and Peschon, emptied their pockets did either one of them have a five or ten dollar bill? A. Yes.

"Q. Who had it? A. Sterns."

From the foregoing it will be observed that the evidence is not clear as to whether Sterns had a single five or a single ten dollar bill, or both.

Later, the police aroused Walters at the Stockman's Bar, took him to the police station and for the first time he was then and there informed he had been robbed. This was the first Walters had any knowledge of the fact his billfold, and the money in it, were missing.

In his own defense the defendant testified he had been employed in the oil fields in North Dakota and that he returned to his home in Chinook at about eight o'clock on the night of December 31; that when he returned to Chinook he had right around two hundred dollars and that $180 of the amount was money which was being saved by both him and his brother to be used in the purchase of a new car and that all of this money was in twenty dollar bills. In addition, his father had given him twenty dollars. Concerning the alleged theft of Walter's billfold or wallet and the touching off his hind pockets, the defendant testified as follows:

"Q. Now along about eleven o'clock of that evening, you were in the Stockman's Bar, were you not? A. Yes.

"Q. And whom were you with? A. I was with Gordon Michaelson.

"Q. When you were there at that time, did you see Walters, the complaining witness in this case? A. I seen the man, yes— I didn't know him.

"Q. Where did you see him? A. He was at the bar when I seen him.

"Q. What position was he in? A. Well, he was pretty drunk —buying drinks.

"Q. He was buying drinks at the time you first saw him? A. Yes.

"Q. Did you later see him change his position at the bar? A. I didn't stay very long. I was back and forth between the bars, but one time I did enter the Stockman's and I seen a man passed out there at the bar.

"Q. Do you recall any time going up and touching his rear pockets? A. No.

"Q. (Continuing) of his trousers? A. No.

"Q. Did you at any time sit down alongside of him for a period of ten minutes during the course of that evening? A. No, I don't think so. I may have sat down to get some change.

"Q. Did you sit down alongside of him for any length of time that you can recall? A. For no length of time, no.

"Q. Did you sit alongside of him at all ? A. Well, as I said, I was back and forth at the bar getting change, and I believe I had a drink sitting there at the bar.

"Q. Did you take any wallet or purse out of his pocket? A. I did not."

Other evidence received at the trial was that during the afternoon of January 1 the defendant cashed a check at the Stockman's Bar in the amount of five dollars. The barmaid, Katherine Immel, came on shift at 5:30 in the afternoon on January 1, New Year's Day. She testified that during the evening of January 1 the defendant purchased some drinks and wrote a check in the amount of five dollars and that the check was cashed not much earlier than 11:00 o'clock that night. The check was returned for want of funds to pay it. As the barmaid said, "It bounced."

The defendant admitted writing the check and stated he had an account in the bank upon which it was drawn and that the only reason he wrote the check was to close out his bank account. Concerning this check and at one point in his testimony, the defendant testified on direct as follows:

"Q. On the day you cashed this check, had you checked how much money you had in the bank? A. No, I did not.

"Q. What did you think you had in the bank at that time? A. I figured I had around $27.00 or $28.00.

"Q. Did you have any reason for cashing that check that you cashed? A. Yes, I was going back to North Dakota, and I wanted to close out that account. I was going back to work."

On cross-examination the defendant testified as follows:

"Q. Then you spent thirty or thirty-five dollars, you say, between the Stockman's and the Elks Bar in Chinook? A. Yes.

"Q. And you still found it necessary to cash a check at the Stockman's Bar? A. It wasn't necessary.

"Q. How come you to do it then? A. I though I had money in the bank, and I wanted to close out the account before I went back to North Dakota.

"Q. How much did you think you had in the bank? A. I figured I had $6.00 or $7.00.

"Q. And you figured a $5.00 check would handle it. A. It would be the biggest part of it, and I couldn't find out how much I had."

Further evidence disclosed the defendant did have a bank account at the time and the balance therein amounted to $1.55.

At around 7:00 o'clock on the evening of January 1, 1955, the defendant purchased a drink for the witness Carol Falcon, and when she was asked how the defendant paid for it the witness replied, "He borrowed thirty cents from Ernie Friede." This last-mentioned testimony was not denied by the defendant, though he was the last witness to testify in the case.

The defendant, in his brief on appeal and his oral argument before this court, poses the question that Walters' billfold or wallet could have dropped to the floor while Walters was asleep at the bar and that no one looked on the floor to determine whether or not the wallet was there. We do not consider this one fact, standing alone, of any great import. In any event, it was for the jury to take into consideration with all the other evidence in the case.

From the foregoing testimony, and considering only that part thereof introduced by the state in its case in chief prior to defendants' motion made to the court requesting the jury to bring in a verdict of not guilty, and without considering the evidence which is favorable to the defendant, but taking into consideration that only which might tend to prove his guilt, we hold the evidence was sufficient to establish a prima facie

case of guilt. R.C.M. 1947, section 94-7227, provides that if, at any time after the evidence on either side is closed, the court deems it insufficient to warrant a conviction, it may advise the jury to acquit the defendant; but the jury is not bound by the advice. This section is applicable to those cases only in which the trial court deems the evidence, although tending to prove every element necessary to constitute the crime charged, insufficient in weight to warrant a conviction. State v. Mahoney, 24 Mont. 281, 286, 61 Pac. 647. The trial court was correct in denying defendant's motion to request the jury to acquit the defendant.

It will be observed the defendant did not elect to stand on his motion but proceeded to introduce testimony on his own behalf, including that of his own. Taken as a whole, defendant's case did not weaken the case of the state, but, in our opinion, added strength to it.

In People v. Appleton, 120 Cal. 250, 52 Pac. 582, wherein the facts are more or less analogous to the facts in the case at bar, the court said:

"Defendant's main contention is that the evidence did not warrant a conviction of grand larceny (the amount taken being less than $50), because, as contended, it did not show that the money was taken from the person of Nolan. At the time the larceny is supposed to have been committed, Nolan was in a drunken sleep on a doorstep. Between 2 and 3 o'clock in the morning defendant and a companion were discovered standing on the sidewalk, very near the sleeping man, in a suspicious manner; they were watched, and seen to move away a short distance and then stop for a few minutes by a fence, after which they started off down the street, when defendant was arrested, his companion running away and escaping. Nolan was immediately aroused, and it was found that his left trousers pocket was turned inside out and empty. The last he remembered before going to sleep, his purse, containing six or seven dollars in silver coin, was in the pocket. After daylight a search revealed the empty purse inside the yard by the fence near the point

where defendant and his companion had been seen to stop. While entirely circumstantial, this evidence fully justified a finding of a taking from the person. True, neither the defendant nor his companion were seen in actual contact with Nolan's person, but the situation was such as to have afforded them the opportunity, and the jury were clearly justified by the circumstances in drawing the inference that the purse was in the pocket when taken and was abstracted therefrom. The argument that there was nothing to show that it had not fallen from the pocket and was not upon the person of Nolan at the time of the taking was for the jury. The suggestion that in certain other respects the evidence was lacking is without merit. It substantially tended to establish defendant's guilt, and its weight was for the jury.''

The prosecution in this case was had under R.C.M. 1947, section 94-2704, which provides:

''Grand larceny is larceny committed with a felonious intent in either of the following cases: * * *

''2. When the property taken is from the person of another. * * * * *''

Under the provisions of this section of the code it is immaterial what amount of money may have been, taken from another, for it is grand larceny to take money from the person of another with a felonious intent no matter what the amount is that is taken. State v. Fisher, 108 Mont. 68, 88 Pac. (2d) 53.

The entire proof offered by the state and received by the court in the case at bar was based upon circumstantial evidence, and neither the state nor the defendant questions the fact that a legal verdict may be based on circumstantial evidence. If we correctly understand defendant's position in the premises, it is that the billfold or wallet of Walters could have fallen on the floor, and no proof having been adduced to show that it was not on the floor, this fact, standing alone, is inconsistent with the hypothesis that the defendant is guilty of the crime charged against him. Whether the wallet did or did not fall upon the floor, whether an investigation was made to determine the

fact, and whether the wallet had been securely buttoned in the right-hand shirt pocket of Walters by the barmaid, as previously related, were matters for the jury, to be considered along with all the other evidence in the cause.

Other testimony on behalf of the defendant, which is urged in appellant's brief as warranting a reversal of the judgment, created conflicts in the evidence, all of which were, by the jury's verdict, resolved against the defendant.

Under all the evidence in this case the jury was warranted in believing the defendant committed the crime of grand larceny as alleged in the information. It is for the jury and not the reviewing court to determine the credibility of a witness and the weight to be given his testimony. State v. Robinson, 109 Mont. 322, 96 Pac. (2d) 265; State v. Espelin, 106 Mont. 231, 76 Pac. (2d) 629; State v. Collett, 118 Mont. 473, 480, 167 Pac. (2d) 584.

Insufficiency of the evidence to justify the verdict. This court on appeal in a criminal case is controlled by the following rules: Disputed questions of fact and the credibility of witnesses will not be considered on appeal. Determination of such matters is within the province of the jury, and so long as there is substantial evidence to support the verdict, it cannot be disturbed on appeal. State v. Messerly, 126 Mont. 62, 69, 244 Pac. (2d) 1054. See, also, State v. Robinson, supra, State v. Harkins, 85 Mont. 585, 281 Pac. 551, and cases therein cited. See, also, State v. Strobel, Mont., 304 Pac. (2d) 606. There was sufficient competent evidence, if believed by the jury, to justify the jury's verdict.

There was nothing in defendant's showing on motion for a new trial which would have justified setting aside the verdict, and the new trial was properly denied.

We have considered the case of State v. Whorton, 25 Mont. 11, 63 Pac. 627. The facts there stated are not of the same character as disclosed by the record in the case at bar. The case is not applicable.

Here, the jury was properly and amply instructed as to the

law in the case, and the rights of the defendant were carefully guarded by the court in its instruction on the law with reference to circumstantial evidence. We find no prejudicial error in the record. The judgment of conviction and the order denying defendant's motion for a new trial are affirmed.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICES CASTLES and ANGSTMAN, concur.

MR. JUSTICE ADAIR, dissenting.

I dissent.

The facts developed follow a time-worn pattern. They closely parallel those shown in the case of State v. McCarthy, 36 Mont. 226, 92 Pac. 521.

The entire proof offered by the state and received by the court in the case at bar was based upon circumstantial evidence.

When a conviction is sought upon circumstantial evidence, the proof must be such as not only to authorize a belief in the guilt of the accused, but also to exclude every other reasonable hypothesis. State v. Mullins, 55 Mont. 95, at page 99, 173 Pac. 788, at page 789.

Convictions may not be founded upon conjectures, however shrewd, nor upon probabilities, however strong, State v. McCarthy, supra; State v. Taylor, 51 Mont. 387, 390, 153 Pac. 275, but only upon evidence which establishes the guilt of the accused beyond a reasonable doubt, that is, upon proof such as to logically compel the conviction that the charge is true. State v. Mullins, supra; State v. Postal Telegraph Cable Co., 53 Mont. 104, 161 Pac. 953; State v. Riggs, 56 Mont. 393, 185 Pac. 165; State v. Riggs, 61 Mont. 25, 201 Pac. 272; State v. Gilbert, 126 Mont. 171, 246 Pac. (2d) 814, 816.

In all of the above-cited decisions this court has recognized and applied the rule that unless the circumstantial evidence fully meets the above tests therein announced, it is insufficient to sustain a conviction.

*The Charge.* The defendant was accused of having committed

the crime of grand larceny. It was charged that on or about January 2, 1955, he did "wilfully, unlawfully and feloniously *take*, steal and *carry away* certain personal property of one Richard E. Walters, to-wit, lawful money of the United States of America in the amount and value of $160, with the intent \* \* \* in him \* \* \* to defraud and deprive the said Richard E. Walters of his said personal property \* \* \*"

To sustain a conviction of larceny every essential element of the crime must be proved beyond a reasonable doubt by sufficient competent evidence. Evidence that raises a mere suspicion, conjecture and possibility is insufficient as a foundation for a verdict. 52 C.J.S. Larceny, section 129, pages 952, 953, notes 96, 97 and 98.

A *taking* or what is technically known as the caption is an essential part of the crime of larceny. It is the actual *taking* into possession or control and is usually accomplished by grasping, seizing or laying hold of an article. If the accused never had control of the property for a single instant he did not *"take"* it. State v. Johnson, 78 Kan. 866, 96 Pac. 216. The mere touching of an article is not a *"taking."* Tarrango v. State, 44 Tex. Cr. 385, 71 S.W. 597. Compare State v. Foster, 26 Mont. 71, 66 Pac. 565; State v. Whorton, 25 Mont. 11, 63 Pac. 627; State v. McCarthy, supra.

In order to constitute larceny the property must not only be *"taken"* but it must also be *"carried away."* Here again the record fails to establish any *"carrying away"* or *"asportation"* by the accused of any money or other personal property belonging to Richard E. Walters.

Of the eight witnesses who testified for the state at Peschon's trial not a single witness testified to either the *"taking"* or the *"carrying away"* by the accused of any article of personal property identified as being the property of Walters.

The testimony is a rather detailed account of a lost weekend—of a protracted spree which began Saturday at dusk and ended Monday at dawn.

*Saturday, December 31, 1954.* Richard Walters, a ranch-hand

traveled from the McLeish ranch where he was employed to Chinook, Montana, a distance of forty-five miles, to spend the week-end which included New Years Eve and New Years Day.

He arrived in Chinook at about 5:00 o'clock on Saturday, evening, December 31, 1954, at which time he had some fifty dollars in cash and a $312.07 check, representing his wages earned.

Immediately upon his arrival he proceeded to celebrate, traveling from bar to bar, drinking and buying drinks for others there gathered. In the course of his travel on this his first night in town, at a bar known as the Bar X, Walters cashed his $312.07 check and was paid mostly in twenty dollar bills and the balance in hard money. After counting his change, Walters deposited the paper money in his leather billfold which he then placed in the right-hand pocket of his shirt where he says he always kept it. At no subsequent time did Walters count any of the money so carried in his billfold.

At about 11:00 o'clock on Saturday night, Lee Falcon, the state's second witness, spent some time with Walters at a tavern in Chinook, known as the Elks Bar.

Concerning Saturday evening, December 31, Walters who was the state's first witness testified:

"Q. And did you do much drinking that evening. A. Yes.

"Q. Did it cost quite a little money? A. I imagine it would.

"Q. You don't remember at all how much you spent? A. *I don't remember how much I spent.*

"Q. Could you give us an estimate as to how much you spent? A. *No, sir.*"

*Sunday, January 1, 1955.* Sometimes after 2:00 o'clock Sunday morning, January 1, Walters repaired to the Chinook Hotel where he had a room. He testified:

"Q. And about what time did you go [to] the hotel? A. I don't have any idea.

"Q. Had the bars closed? A. Yes.

"Q. Do you know what time they close here? A. Two o'clock.

"Q. So it was sometime after that you went to the hotel? A. Yes. * * *

"Q. And after you got up the next morning, *did you check your wallet to find out how much money you had?* A. *I never.* * * *

"Q. When you got up that morning of January 1, Sunday morning, your wallet was in your pocket at that time? A. It was, yes.

"Q. *But you didn't check how much money was in it?* A. Just several bills was in it. *I didn't pay any attention as to the particular amount. I didn't count to see how much was in it, no.*"

There is no evidence that Walters or any other person ever counted Walters' money at any time or place other than on Saturday night, December 31, at the Bar X at the time of the cashing of the $312.07 check.

On his direct-examination by the county attorney, Walters further testified:

"Q. Did you go back to any local bars the following day? A. Yes, sir. * * *

"Q. And do you remember what bar you were in toward the close of your drinking that day? A. At the Stockman's Bar.

"Q. *Can you recall now what time* New Years Day *you went in the Stockman's Bar?* A. *No, I don't.*

"Q. Do you remember buying any drinks at the Stockman's Bar? A. Yes, sir.

"Q. What is your last recollection of your being in the Stockman's Bar? A. I was sitting at the bar drinking—visiting with different people.

"Q. *Do you know whether or not you went to sleep or passed out?* A. *Yes, I remember I was—first thing I just didn't know anything.*

· "Q. Do you remember putting your head down on the bar? A. No, sir.

"Q. According to your last recollection, before you passed out, did you have any money left? A. Yes, sir.

"Q And do you recall about how much money you had left? A. I had several twenty dollar bills.

"Q. *Do you have any idea what you had?* A. *No, I don't.*

\* \* \*

"Q. Do you remember handing your billfold to the barmaid? A. No, sir.

"Q. (continuing) at any time? A. No, sir.

"Q. What is your first recollection after you passed out that night? Do you remember anyone waking you up? A. The policeman took me over to the police station.

"Q. And you were awake at that time. A. Well, *I just remember when I got over there; that's the first I remember.*

"Q. *And at that time, did you check to see whether you had your billfold with you?* A. *No, sir, I hadn't even checked.*

"Q. Then, when was the first time you checked to see whether you had your billfold? A. *The policeman told me I had been robbed, so I felt and it was gone.*

"Q. Where was that? A. In the police station.

"Q. Were you able to find your billfold at that time? A. No, sir. Q. (continuing) on your person? A. No, sir.

"Q. *Now before you passed out at the Stockman's Bar, can you remember any particular person sitting near you?* A. *Not anyone particular, no.*

"Q. Do you know the defendant, Edward Peschon? A. *No, sir.*

"Q. I assume you didn't know Edward Peschon on that night? A. *No, sir.*

"Q. *And do you remember anyone removing anything from your pocket?* A. *No, sir.*

"Q. Was there any way that you could identify the money which you were carrying that night? A. *Only just—it was mostly in twenty dollar bills.*

"Q. *There is no way you can tell those from any other twenty dollar bills?* A. *No, sir.*

"Q. Have you ever seen your billfold since that night? A. No, sir."

On cross-examination Walters further testified:

"Q. After you got to the Stockman's, did you buy any drinks there? A. Yes, sir.

"Q. And do you recall who you bought them for? A. No.

"Q. Do you know how many drinks you bought at the Stockman's? A. Several rounds.

"Q. For about how many people? A. There must have been six or seven there.

"Q. Do you recall paying for them? A. Yes, sir.

"Q. *Do you recall the kind of bills that you used to pay for them? A. No, sir.* * * *

"Q. Do you recall sitting at the bar in the Stockman's? A. Yes.

"Q. And about how long had you been in the Stockman's at the time you recall sitting at the bar? A. I recall being there and then all at once I didn't know anything.

"Q. Is that when you passed out? A. Yes.

"Q. *About how long had you been in the Stockman's Bar before you passed out? A. I don't know.*

"Q. Can you tell the jury approximately? A. No.

"Q. *Were you in there more than an hour? A. Quite a few.*

"Q. *Would it be as much as two hours? A. Yes.*

"Q. *Could it have been more than that? A. I wouldn't know.*

"Q. Do you recall how many times you bought drinks in the Stockman's Bar? A. No, sir.

"Q. Could you tell the jury approximately how many times? A. No.

"Q. Did you spend any money at all in the Stockman's? A. Yes, sir.

"Q. Do you know how much? A. No.

"Q. At the time you were sitting at the bar in the Stockman's, just immediately before you passed out, I think you stated that you were talking with people along the bar? A. Different people, yes.

"Q. Were there quite a number of people there? A. Quite a few people, yes.

"Q. Sitting up at the bar? A. Yes.

"Q. About how many would you say were sitting at the bar? A. I wouldn't say how many; I couldn't say.

"Q. Do you recall cashing any bills at the Stockman's? A. *Yes, I cashed some bills there.*

"Q. *Do you recall how many?* A. *No.*

"Q. *Well, could you tell the jury how many you had in your wallet when you were in the Stockman's?* A. *No.*

"Q. *Could you tell the jury how much money you had spent the night before and up to the time you came to the Stockman's the next evening?* A. *No.*

"Q. *Do you have any way of arriving at the amount of money that you might have spent?* A. *No.*

"Q. *Could* you have spent as much as $60.00? A. Yes.

"Q. *Could* you have spent more than that. A. I *could* have spent a little more than that; yes.

"Q. By a little more, how much do you mean? A. *I wouldn't know, because I didn't keep track of how much money I was spending.*

"Q. Well, how much did you have? A. *I wouldn't know how much I had.*

"Q. You say you had several twenty dollar bills? A. Yes. * * * *I never counted them,* but just by the looks of it there was that much money in there.

"Q. *Just by guessing on your part?* A. *Yes.*

"Q. *In short, you don't know how much money you had?* A. *No.* * * *

"Q. And the first time you knew you didn't have your wallet was over at the police station? A. Yes, sir."

About 11:00 o'clock Sunday night, January 1, Lee Falcon and Joe Briere's daughter Carol entered the Stockman's Bar in Chinook and took seats at the bar near the bar stool then occupied by Richard Walters. Lee Falcon then talked with Walters and *introduced* him to Carol.

On his direct-examination by the county attorney, Lee Falcon testified:

"Q. What was Walter's condition at that time? A. *Well he was pretty drunk.*

"Q. Can you state now whether or not he had any money at that time? A. Well, *when he paid for our drinks I seen his wallet, and I knew he had some bills in it.*

"Q. What did he do with the wallet at that time? A. *He handed it to the barmaid,* and she took out a twenty dollar bill, and she put fifteen dollars back in the billfold.

"Q. Well, at that time were you able to see whether there was any other bills in the billfold? A. No, sir.

"Q. And do you know what was done with the billfold after these drinks were paid for? A. It was stuck back in Walters' shirt.

"Q. Who put it back in Walters' shirt? A. Katherine.

"Q. The barmaid? A. Yes, sir.

"Q. Did Walters pass out at the bar that evening at any time you were there? A. *Well, after he paid for our drink he did.*

"Q. About how long after that? A. I would say it wasn't over ten or fifteen minutes.

"Q. What did he do then? A. *He just laid his arms on the bar and went to sleep.*

"Q. Did he put his head on his arms? A. Yes."

On his cross-examination the witness Lee Falcon testified:

"Q. You observed Ed [the defendant] sitting down at the bar? A. Yes, sir.

"Q. And what did you observe him do? A. He sat down there and laid his arms on the bar; *that's all I saw him doing.* He folded them like that. * * *

"Q. Well, now, you saw Ed with his arms folded for ten minutes there at the bar. What would lead you to believe Ed had taken the wallet? A. *Well, I couldn't say.*

"Q. In other words, have you any reason at all for making the statement that he stole the wallet? A. *No, I haven't.*

"Q. Well, in other words then, as I understand your testi-

mony, *you can't tell this jury that Ed did take this wallet?*
A. *No, sir.* \* \* \*

"Q. Were you trying to protect yourself—is that why you made this complaint? A. No, sir.

"Q. In other words, as I understand it, you don't have any justification for making the complaint?

"The Court: Now, just a minute; that's an argumentative question. Just ask him for facts and let the jury decide whether he had any justification.

"Q. (By Mr. Gillan) In other words, *you didn't see anything that would lead you to believe that Ed took that wallet, did you?* A. *No, sir.*"

*Monday, January 2, 1955.* Lee Falcon did not see the defendant Peschon in the Stockman's Bar at any time before Walters "passed out," but later he "just happened to notice him pass by" on his way to and from the lavatory. Falcon testified that *after* defendant came from the lavatory he went up close to Walters and was touching both his hind pockets, and that defendant then seated himself at Walter's right with his arms on the bar. Falcon said that then he was unable to see what was going on "because Walters was laying down there." However Falcon told his companion Carol "to look over there" to see if she could see what was going on between the defendant and Walters. The time was then "a little after midnight" which would make it early Monday morning, January 2d.

The county attorney's direct-examination of Lee Falcon commenced as follows:

"Q. Will you state your name? A. Lee Falcon.

"Q. Where do you live? A. Chinook, Montana.

"Q. *You are a married man?* A. *Yes, sir.*

"Q. What is your wife's maiden name? A. Carol Briere.

"Q. What is your occupation? A. Farm hand."

The first two questions were proper. The third question was improper It is a leading question. It placed the desired answer in the mouth of the witness. It commanded an affirmative answer. It did not *ask:* "Are you married or single?" It *de-*

*clared:* "You are a married man." And Falcon said, "Yes, sir."

The cross-examination of the state's witness, Lee Falcon, conducted on March 11, 1955, by defendant's counsel is quite revealing. According to the record, it began as follows:

"Q. You say you are married? A. Yes, sir.

"Q. Who is your wife? A. Carol Falcon.

"Q. Where were you married. A. *We wasn't married.*

"Q. What? A. *I said we didn't get married.*

"Q. Didn't you just say you were married?

"Mr. Thomas: Objected to as being irrelevant and immaterial.

"The Court: You mean, whether there was any marriage ceremony performed, is that what you are trying to find out?

"Mr. Gillan: Well, your Honor, I asked him if he was married and he said he was, and I just asked him where he was married.

"The Court: *You mean, she is living with you as your common-law wife?* A. Yes, sir.

"Q. (By Mr. Gillan) What is your employment? A. Farm hand.

"Q. And when did you last work? A. I have been tagging sheep all winter just off and on.

"Q. Whom were you working for? A. My father-in-law.

"Q. What is his name? A. Joe Briere.

"Q. Was he paying you any wages? A. Yes, sir.

"Q. How much have you earned this winter? A. *Well, I couldn't say.* * * *

"Q. Have you drawn any unemployment compensation in that period? A. Starting after New Year's.

"Q. Have you been employed since New Year's? A. No, sir. * * *

"Q. Are you still drawing unemployment compensation? A. Yes, sir."

The *law* requires considerably more than is shown by the record before us to make teen age, Carol Briere, the common-law wife of the state's witness Lee Falcon. Compare Miller v. Sutherland, Mont. 309 Pac. (2d) 322.

The *law* also requires more than a mere informal "shacking up" for the winter with his daughter to make Carol's parent the "father-in-law" of the witness Lee Falcon.

*Walter's Wife:* Apparently the county attorney deemed it important to provide both Richard Walters and Lee Falcon with the stabilizing influence of a wife without first asking either witness the direct question, "Are you a single or a married man?" In his direct-examination of the state's first and principal witness Walters, the county attorney proceeded thus:

"Q. Will you state your name? A. Richard E. Walters.

"Q. Where do you live? A. I have been living and working on a ranch. * * *

"Q. Were you employed at that ranch prior to January 1, 1955? A. Yes, sir.

"Q. And for how long immediately prior to January 1 of this year had you been employed there? A. One month.

"Q. *Was your wife, also, employed there?* A. Yes, sir.

"Q. Where were you on December 31, 1954? A. Here in the City of Chinook.

"Q. And did you come into Chinook from the ranch on that day? A. Yes, sir.

"Q. *You and your wife were together?* A. Yes."

The interrogatory, *"Was your wife employed there?"* assumes a state of facts not theretofore shown to exist in that it *assumed* that Walters then was a married man and that he then had a wife.

The subsequent declaration, *"You and your wife were together?"* is a leading question or statement by the prosecutor which *assumes* another state of assumed facts not theretofore shown to exist and which places the direct affirmative answer in the mouth of the witness Walters.

The importance of the marital status of witness Walters cannot be minimized in view of his testimony to the effect that sometime after 2:00 o'clock on Sunday morning, January 1st, he turned in and went to bed at the Chinook hotel which was

hours after the time on Saturday night, December 31st, when he cashed his $312.07 check at the Bar X Bar.

On his cross-examination concerning his activities on Saturday night, December 31st, Walters testified as follows:

"Q. Was *your wife* in town with you that night? A. Yes, sir.

"Q. Was *she* with you—that would be Saturday night, the 31st? A. Yes, sir.

"Q. *She* was with you? A. Yes, sir.

"Q. And about what time did you go to the hotel? A. I don't have any idea.

"Q. Had the bar closed? A. Yes.

"Q. Do you know what time they close here. A. Two o'clock.

"Q. So it was sometime after that you went to the hotel? A. Yes.

"Q. And was *your wife* with you? A. Yes, sir.

"Q. And after you got up the next morning, did you check your wallet to find out how much money you had? A. *I never.*"

The information on which the defendant was charged, tried and convicted was filed on January 11, 1955, being but nine days after Walters missed his billfold and its contents. The names of all the state's witnesses were endorsed on such information, but the name of the woman who accompanied Walters to the Chinook hotel on Sunday morning, January 1st, nowhere appears in this list nor did the county attorney produce her or attempt to justify his failure and omission to produce or subpoena her as a witness at the trial. She may have had an inkling at least of the amount of money Walters then had. She may have given some thought about protecting Walters from himself, his weakness and his folly. She may have taken at least one quick peek in the billfold to see how their cash was holding out in the light of Walter's condition and the direction in which he was headed. She could have tucked some of the folding money in her stocking to present to Walters when he finally sobered up. In my opinion these are all reasonable hypotheses. Compare State v. Mullins, supra, and State v. McCarthy, supra.

352

The state's third witness at the trial was Carol Briere, a young girl who then lived with her parents, Mr. and Mrs. Joe Biere, in the south part of Chinook. She testified that about 7 o'clock on Sunday evening, January 1st, she stopped at the Stockman's Bar for about ten or fifteen minutes; that she then went to a dance in the country north of Chinook; that upon her return from the dance she and Lee Falcon came to the Stockman's Bar, arriving there about 11:00 o'clock that night, at which time she observed Richard Walters sitting at the bar; that seated on the next stool on Walter's left was one Paul Clark; that Walters then "was pretty intoxicated"; that the witness Carol took the stool to the left of Clark and Lee Falcon ook the one to the left of Carol; that soon after the witness Carol was seated Clark departed from the bar leaving an empty bar stool between Carol and Walters; that Lee Falcon *introduced* Carol to Walters and that Walters "bought some drinks and then he *passed out* after a while."

Carol, upon her direct-examination by the county attorney, further testified:

"Q. Did you notice whether or not he [Walters] had any money? A. I knew he had some money, but *I didn't know how much he had on him.*

"Q. *Did you see his billfold at any time that evening?* A. *No, I didn't.*

"Q. Did you see any money, or any other article, pass between Walters and the barmaid? A. She gave him some change back from what he had paid for the drinks with. She gave him some change back.

"Q. *Did you observe any occasion when she may have put the billfold in his shirt pocket?* A. *No, I didn't. I don't remember.*

"Q. Who was tending bar at that time? A. Katherine.

"Q. Do you know what her last name is? A. No, I don't.

"Q. Do you know the defendant, Edward Peschon? A. Yes. * * *

"Q. Can you state whether or not he was in the bar when

you came into the bar at 11:00 o'clock that night? A. Well, I don't know if he was already in there, or if he came in after we did; I couldn't say. * * *

"Q. Was he sitting down? A. Yes.

"Q. And was he on the stool immediately to the right of Walters? A. Yes.

"Q. Could you tell what he was doing at the time? A. *Well he wasn't doing anything.* He had his hands on top of the— I mean, he had his arms on top of the bar.

"Q. *Could you see his hands?* A. *No, I couldn't see his hands.*

"Q. What was Walters' condition at that time? A. Well, he had passed out then—at that time.

"Q. How was Walters sitting at the time—what position was he in? A. He had his arms and his head down. * * *

"Q. And as I understand it, *you weren't able to see Peschon's hands?* A. *No, I couldn't see his hands.*

"Q. How long did Peschon stay there so far as you noticed? A. He didn't stay there too long. * * *

"Q. And did you see Peschon get up from the bar? A. Yes.

"Q. And did you observe what he did after he got up? A. He went to the lavatory.

"Q. Do you know if he went by himself? A. No, he was with Gay Sterns and Gordon Michaelson when he went to the lavatory. * * *

"Q. And at any time during that evening, did you ask the barmaid to check Walters' pocket for his billfold? A. Yes, *after Lee told me to ask Katherine I asked Katherine if he had his money, and she checked and it wasn't there.*

"Q. Did you do anything after that? A. Who?

"Q. You. A. I called the cops."

On her cross-examination Carol was interrogated and she made answer as follows:

"Q. And did you see him (defendant) do anything that would lead you to believe that he reached into Walters' pocket

and took his wallet? A. *Well, I don't know,* but he acted pretty funny to me.

"Q. *Did you see him?* A. *No, I didn't see him do anything like reaching in his pockets.*

"Q. I understand that you asked the barmaid to look in his pocket, into Walters' pocket to see if the money was there? A. Yes.

"Q. Now, did you look on the floor of the barroom under the seat where Walters was sitting? A. I didn't.

"Q. Well what was the reason that you called the officers? A. Well, because he had the money. *The waitress said that she put the wallet in his pocket and buttoned it,* and when she looked, why, it wasn't there—it was gone—so I called the cops.

"Q. You base that call on the fact that Ed sat down along side of Walters at the bar, is that correct? A. *Yes.*

"Q. You didn't look on the floor to see if the wallet could have fallen on the floor? A. *I didn't. I don't know whether anybody else did or not.*

"Q. You didn't check to see if that could have happened, is that correct? A. *No.*

"Q. *You didn't look?* A. *No.*

"Q. *Did the bartenders look on the floor?* A. *I don't know.*

"Q. *No one looked on the floor to see if the wallet could have been there?* A. *I didn't notice. I don't know—I didn't look.*

"Q. *Did the barmaid say she had seen Ed take the purse?* A. *No, she didn't say she saw him.*

"Q. Was there any reason why you called the police and accused Ed of taking this purse? A. *I can't say.*

"Q. You have no reason? A. *No.*

"Q. *Well, as you are sitting there, can you say that Ed took that purse?* A. *I couldn't prove it if I didn't see it.* * * *

"Q. *Did you accuse anyone in that conversation of robbing Walters?* A. *I don't think so.*

"Q. Can you detail to the jury what you did say? A. No.

"Q. Do you know that shortly after you did call, the officers came down? A. Yes, they came down. * * *

"Q. What did you say to them when they came down there? A. Why, I told them that *I thought* Edward Peschon had gotten away with Walters' money. * * *

"Q. *But you didn't see Ed take that money?* A. *No, I didn't see him take the money. I couldn't see his hands.* * * *

"Q. Did anyone else in the barroom, after the officers got there at your request, say to the officers or accuse anyone of taking Walters' money? A. *I don't think so.*

"Q. You were the only one in the bar that made the accusation, is that correct? A. I didn't hear what everybody else said.

"Q. Weren't you right there talking to the officers? A. Yes, but they were talking to other people and asking them questions. I didn't pay any attention to what they said.

"Q. *Did you hear anyone else in the barroom that Night accuse Ed of taking the money?* A. *No.*

"Q. *As far as you know, you are the only one that made a complaint?* A. *As far as I know maybe somebody else did, but I don't know.*

"Q. How old are you? A. *Nineteen.*"

Katherine Immel, the bartender at the Stockman's Bar, was the state's fourth witness. On her direct-examination she testified: That on Sunday, January 1st, she *alone* worked the evening shift at the Stockman's Bar in Chinook, commencing at 5:30 p.m.; that at about 11:00 o'clock that night Richard Walters entered the place and sat down at the bar and that she observed he was carrying his money in a billfold.

On her direct-examination by the county attorney, the witness Katherine Immel testified:

"Q. Now at any time that evening, *did you handle Mr. Walters' billfold?* A. *Yes, sir.*

"Q. And can you state now about what time that might have been—*what time that evening?* A. *It was right after he came in.*

"Q. And what was the purpose of your handling the billfold? A. *He was pretty well intoxicated,* and I was busy, and *he handed his billfold to me, and I took out a twenty dollar bill for a drink,* and I put the paper money back in the billfold and left the silver on the bar.

"Q. At that time, did you observe whether there was any money in the billfold? A. There was quite a bit; *I couldn't say how much.*

"Q. Did you observe what kind of money it was? A. Twenties. * * *

"Q. *Did you count the number of twenty dollar bills?* A. *No, sir.*

"Q. *Could* there have been more than five or six? A. There *could* have been.

"Q. What did you do with the billfold? A. I put it back in his pocket and buttoned it.

"Q. Was this money in his billfold at the time you put it back in his pocket? A. Yes, sir—all but the change.

"Q. All but the silver? A. Yes.

"Q. *Can you state whether or not Mr. Walters bought any drinks after you had put the billfold back? A. No, sir, he passed out then.*

"Q. Did you see either Lee Falcon or Carol Falcon in the bar that night? A. Yes, sir.

"Q. And do you remember now when they came in? A. No, I couldn't say.

"Q. Were they there at any time when Mr. Walters was in there? A. Yes, sir.

"Q. And do you recall now where they sat at the bar relative to Mr. Walters? A. They were sitting on the left-hand side—there was one stool between them.

"Q. You mean the left-hand side of Walters? A. Yes.

"Q. Do you recall now which of the two Falcons was sitting closer to Mr. Walters? A. Carol.

"Q. *Can you state whether or not the Falcons were sitting*

*as you have now said at the time Walters passed out?* A. *That's right, and they left right after that.*

"Q. They were at the bar at the time Walters passed out? A. Yes, sir.

"Q. Did you notice what Walters did when he passed out? A. He laid down on the bar and went to sleep.

"Q. At any time during the night of January 1, did you see Ed Peschon in the Stockman's bar? A. Yes, sir. * * *

"Q. Did you see him there at any time while Mr. Walters was there? A. Yes, sir.

"Q. And where was he at that time? A. Right-hand side.

"Q. Walters' right-hand side? A. Yes, sir. * * *

"Q. Was he seated on a stool at the bar? A. Yes, sir.

"Q. I am referring to Peschon, now? A. Yes, sir.

"Q. Where was the stool on which he was seated in relation to the one that Walters was on? A. *There was one empty stool between them.*

"Q. An empty stool between Peschon and Walters? A. *Yes, sir.*

"Q. Did you observe anything at all that might have gone on between Peschon and Walters? A. *No, sir.*

"Q. (Continuing) while they were there? A. No, sir.

"Q. Did you observe how long Peschon was at the bar? A. Not very long after they called the cops. * * *

"Q. At any time *before* the cops, or the police were called, did you check the pocket of Walters where you had placed the billfold? A. Yes, sir.

"Q. Why did you do that? A. *Carol and Lee told me that the money was gone, so I looked and it was.*

"Q. Was the billfold, also gone? A. Yes, sir."

There is no evidence whatever that anyone other than Walters himself and Katherine Immel, the bartender, ever had possessed or even touched Walters' billfold or money.

All the witnesses agree that at the time he was in the Stockman's Bar, Walters was in a thoroughly intoxicated condition

and long past the stage where it was lawful for any bar owner or employee to sell him any liquor.

R.C.M. 1947, section 4-160 provides: "No vendor * * * nor any employee of a vendor * * * shall sell any liquor, or permit any liquor to be sold, to any person apparently under the influence of liquor."

R.C.M. 1947, section 4-413, provides: "No licensee or his or her employee or employees, nor any other person, shall sell, deliver, or give away or cause or permit to be sold, delivered or given away any liquor, beer or wine to:

"1. Any person under the age of twenty-one (21) years.

"2. Any intoxicated person or any person actually, apparently or obviously intoxicated. * * *"

It is quite apparent that Walters was actually and obviously intoxicated and so far gone that he could neither open nor close his billfold nor identify nor count its contents. Yet, with the aid of a most obliging bartender he continued to buy liquor for himself and his associates until he *passed out* and went to sleep on the bar. See R.C.M. 1947, section 4-159, subd. 2.

Again the law was violated in selling, delivering or giving away liquor or in permitting it to be sold, delivered or given to the state's teen-age witness Carol. See R.C.M. 1947, sections 94-35-106 and 4-413, subd. 1.

It was Lee Falcon and Carol who first discovered that Walters had neither billfold nor money which discovery they reported first to the bartender Katherine, who had handed Walters his last drink, and next to the police.

On her cross-examination Katherine Immel testified:

"Q. Now, I believe you stated that Walters handed his wallet to you at one time? A. Yes, sir

"Q. What size of a bill did you take out? A. Twenty dollar bill. * * *

"Q. About how long was it between the time you put that wallet back in his pocket and When Carol Falcon made this complaint? A. I would say about ten minutes.

"Q. Now during that interval, I understood you to say that Ed Peschon was in the bar? A. Yes, sir.

"Q. He was seated on a stool at the bar? A. Yes, sir.

"Q. And had he ordered a drink? A. Yes, sir.

"Q. And did I further understand you to say that *there was one empty stool between him and Walters?* A. At that time, yes, sir—when he ordered the drink.

"Q. *He never got any closer than one stool removed from Walters?* A. *Not that I recall.*

"Q. After he had ordered this drink, do you recall how long he stayed in the bar? A. Not very long. Oh, ten minutes, maybe.

"Q. And at that time while you were there serving that drink and while Walters was passed out on the bar, were there other customers in the bar? A. Yes, sir.

"Q. *About how many?* A. *I would say about fifteen or twenty.*

"Q. *And everything was in full view of all of those customers, was it not?* A. *Yes.*

"Q. *Did you observe anything that would lead you to believe that Ed Peschon took this purse from Walters' pocket?* A. *No, sir.*

"Q. You were observing the bar all during the time that Peschon was in the bar? A. Yes.

As stated at the outset of this opinion the *modus operandi* in State v. McCarthy, supra, closely parallels that in the instant case of State v. Peschon.

*The McCarthy Case.* The evidence in State v. McCarthy, supra, showed:

William Wright, a resident of Pony, Montana, arrived in Butte between 2:00 and 3:00 o'clock on the morning of January 9, 1907. He went to bed at a rooming house near the railroad depot in South Butte and arose about 7:00 o'clock the same morning when he took two drinks of whisky, had breakfast, met a stranger called "the Frenchman" and then went to the central part of Butte where he again met "the Frenchman" with whom

he had a drink or two and then at about 1:00 p. m. Wright and "the Frenchman" returned to South Butte on the streetcar together.

Wright then "knocked around" for a few hours and finally entered McCarthy's saloon where he had another drink or two with "the Frenchman."

Wright then accompanied McCarthy to a wine room in the rear of the saloon where McCarthy *introduced* Wright to a woman known as May Miner for whom Wright bought three or four drinks. Thereafter May Miner bought a drink for Wright. Upon downing this drink, Wright immediately passed out and knew and remembered nothing for about four hours. When Wright lost consciousness he was in the wine room. When he finally woke up he was out in the barrom sitting in a chair and there were several other persons in the barroom at such time.

At the time he was *introduced* to the woman, Wright wore two pair of overalls. In the pocket of the inner pair he had a pocketbook containing about $110. When he woke up in the barroom he felt for his money and found his pocketbook had been taken from his inner overalls pocket and placed in a pocket of the outer pair and that the money was all gone with the exception of $3 or $4. Wright did not know where he may have been between the time he went to sleep in the wine room, after taking his last drink with the woman May and the time he was awakened while sitting in a chair in the barroom.

*The Peschon Case.* The evidence in the instant Peschon case showed:

Richard W. Walters, who resided at the McLeish ranch, arrived in Chinook late Saturday evening, December 31, 1954. He spent Saturday night and at least until 2:00 o'clock Sunday morning traveling from bar to bar drinking and buying drinks for others.

In the course of his travels Saturday night Walters met the state's witness Lee Falcon at the Elks bar in Chinook.

Sometime after 2:00 o'clock on Sunday morning, January 1, 1955, Walters went to bed at the Chinook hotel. He arose about

8:00 o'clock the same morning, had breakfast and then when the bars opened, he again traveled from bar to bar drinking and buying.

The witness Mrs. Gorman testified that on Sunday afternoon, January 1st, from about 3:00 o'clock until 6:00 o'clock when her shift as barmaid ended, Richard Walters was in the Elks bar with Lee Falcon for whom Walters bought drinks all afternoon and that at 6:00 o'clock when she went home Lee Falcon "was still there * * * but Walters had passed out."

Later that same Sunday night Lee Falcon and the girl Carol seated themselves near Walters at the Stockman's Bar at which time Lee Falcon *introduced* Walters to Carol. Walters was "pretty drunk" but nevertheless he bought one drink each for Falcon, Carol and himself. Immediately upon taking his drink Walters passed out and he remembers nothing until he woke up in the police station Monday morning, January 2, 1955, only to find that he had lost his billfold, his money, his week-end and that his spree was over.

The rule in this jurisdiction as to the amount, kind and character of evidence required in order to sustain a verdict and judgment of conviction upon circumstantial evidence and what amounts to "substantial evidence" sufficient to support such a verdict and judgment has been frequently announced and applied by this court. See: State v. Allen, 34 Mont. 403, 415, 87 Pac. 177; State v. McCarthy, supra; State v. Whorton, supra; State v. Foster, supra; State v. Welch, 22 Mont. 92, 98, 99, 55 Pac. 927; State v. Northern Pac. Ry. Co., 41 Mont. 557, 562, 111 Pac. 141; State v. Suitor, 43 Mont. 31, 114 Pac. 112; State v. Taylor, supra; State v. Sieff, 54 Mont. 165, 168 Pac. 524; State v. Postal Telegraph Cable Co., supra; State v. Mullins, supra; State v. Brower, 55 Mont. 349, 177 Pac. 241; State v. Riggs, supra; State v. Cooper, 78 Mont. 35, 252 Pac. 376; State v. Schrack, 60 Mont. 70, 198 Pac. 137; State v. Woolsey, 80 Mont. 141, at pages 158, 159, 259 Pac. 826; State v. Konon, 84 Mont. 255, 274 Pac. 1060; State v. Hood, 89 Mont. 432, 436, 437, 298 Pac. 354; State v. Ebel, 92 Mont. 413, 15 Pac. (2d) 233; State

v. Lund, 93 Mont. 169, at page 184, 18 Pac. (2d) 603; State v. Gilbert, 126 Mont. 171, 246 Pac. (2d) 814; State v. Elmore, 126 Mont. 232, 247, Pac. (2d) 488.

In State v. Riggs, 61 Mont. 25, at pages 51, 52, 53, 201 Pac. 272, at page 280, this court said:

"We are committed to the doctrine that—'A defendant may not be convicted on conjectures, however shrewd, on suspicions, however justified, on probabilities, however strong, but only upon evidence which establishes guilt beyond reasonable doubt; that is, upon proof such as to logically compel the conviction that the charge is true'. [Citing cases]. * * *

"Where an act may be attributed to a criminal or an innocent cause, it will be attributed to the innocent cause rather than the criminal one. [Citing case].

"The evidence is entirely circumstantial, and in our opinion is not adequate to support the verdict; the testimony not being sufficiently strong and convincing to exclude every rational hypothesis other than the defendant's guilt. * * *

"But where a conviction is sought solely upon circumstantial evidence, the criminatory circumstances proved must be consistent with each other and point so clearly to the guilt of the accused as to be inconsistent with any other rational hypothesis. [Citing cases].

"The nature of circumstantial evidence being such that a certain conclusion or state of facts is sought to be inferred from the establishment of other facts, it is necessary, not only that the guilt of the accused be consistent with those facts but they must exclude every reasonable hypothesis other than his guilt; ·or as it is sometimes expressed, they must be susceptible of explanation upon no reasonable hypothesis consistent with the innocence of the accused. The reason for this is that as long as ·circumstances are capable of two or more explanations, one consistent and the other inconsistent with his innocence, the evidence does not fill the test of moral certainty, and is therefore insufficient to convict. * * *

"We are not unmindful that we are limited on our review

to an examination of the record to determine whether there is any substantial evidence to justify the verdict. [Citing case]. But where the evidence is unsubstantial, or is wholly lacking in material particulars, or where it is meager, fragmentary, disconnected and speculative, as in this case, it is insufficient; and when a conviction results, based on such testimony, this court will not hesitate to set aside the verdict. * * * It is far better that a guilty man should go unpunished, than that an innocent person suffer punishment based on such evidence.''

The rule as to the amount, kind and character of evidence required in order to sustain a verdict and judgment of conviction upon circumstantial evidence, or rather what amounts to ''substantial evidence'' has been frequently announced and applied by this court.

In State v. Konon, 84 Mont. 255, at pages 261-263, 274 Pac. 1060, at page 1061, this court said:

''Conceding the truth of all such circumstantial evidence, it does not establish the defendants' guilt beyond a reasonable doubt, and therefore the judgment cannot be permitted to stand. In order to justify conviction, guilt must be established beyond a reasonable doubt. * * * A person charged with crime 'is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal'. * * * And the law is settled in this jurisdiction that 'a defendant may not be convicted on conjectures, however shrewd, on suspicions, however justified, on probabilities, however strong, but only upon evidence which establishes guilt beyond reasonable doubt, that is, upon proof such as to logically compel the conviction that the charge is true'. [Citing cases]. * * *

''The settled rule is that, in order to sustain a conviction on circumstantial evidence, all the circumstances proved must be consistent with each other, and with the hypothesis of the defendant's guilt, and at the same time inconsistent with any other rational hypothesis. [Citing case]. The evidence is wholly circumstantial, and in our opinion, insufficient to sustain the

verdict. It fails altogether to meet the requirements of the rule just stated. It must appear to a moral certainty that the crime was committed by the accused and no one else. [Citing cases]. And where, as here, there is no substantial evidence to support the judgment, it becomes our duty to set it aside. [Citing case].''

In Gardner v. State, 27 Wyo. 316, 196 Pac. 750, 752, 15 A.L.R. 1040, which cites the case of State v. Mullins, supra, the supreme court of Wyoming said:

''Where circumstantial evidence is relied upon for conviction, it must be of such a character that it leads to but one fair and reasonable conclusion, pointing to the defendant to the exclusion of all others as the guilty person.''

The evidence in the instant case does not meet the above requirement. It does not point to the defendant Edward Peschon to the exclusion of all others as the person guilty of slipping Walters the drink that knocked him out and then relieving him of his roll, if any.

In my opinion defendant's motion to request the jury to return a verdict of acquittal made at the conclusion of the state's case, and his motion for a new trial should have been granted. Under the above cited decisions of this court there is insufficient evidence to sustain the verdict. The verdict and judgment are contrary to both the law and the evidence and they, together with the order appealed from, should be reversed and the cause be remanded to the district court with directions to grant a new trial or to dismiss.